709 A.2d 1212

**ATTORNEY GRIEVANCE COMMISSION**

v.

**Stuart L. ALISON.**

**Misc. No. AG 65, Sept. Term, 1996.**

Court of Appeals of Maryland.

May 19, 1998.

624

Melvin Hirshman, Bar Counsel, and John C. Broderick, Asst. Bar Counsel, for the Attorney Grievance Com'n of Maryland, for petitioner.

Lawrence P. Pinno, Jr., Bel Air, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

We are once again called upon to discipline Stuart L. Alison [1] (Respondent) who was admitted to the Maryland bar in 1978. At the direction of the Review Board, the Attorney Grievance Commission of Maryland (Petitioner) through Bar Counsel filed a petition for disciplinary action against Respondent pursuant to Maryland Rule 16–709. In the petition, it is alleged that Respondent has engaged in misconduct, as defined by Maryland Rule 16–701k,[2] with regard to three unrelated cases. We ordered that this matter be transmitted to Judge Alfred L. Brennan, Sr., of the Circuit Court for Baltimore County for a hearing. A hearing was held on October 27, 1997, and shortly thereafter Judge Brennan issued his findings of fact and conclusions of law. Respondent subsequently filed a motion to dismiss and also filed exceptions to Judge Brennan's findings and conclusions. We will address the allegations against Respondent, Judge Brennan's findings of fact and conclusions of law, and Respondent's exceptions as to each case separately.

---

**1.** In *Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 565 A.2d 660 (1989)(hereinafter *Alison I* ), we imposed a ninety-day suspension upon Respondent for engaging in misconduct in violation of Maryland Lawyers' Rules of Professional Conduct 4.4 and 8.4(d).

**2.** Maryland Rule 16–701k defines "misconduct" as "an act or omission by an attorney, individually or in concert with any other person or persons which violates the Maryland Rules of Professional Conduct, as adopted by Rule 16–812, whether or not the act or omission occurred in the course of an attorney-client relationship."

## I. Danielle Lynn Koziol, et al. v. State Farm Mutual Automobile Ins. Co.

The first complaint involved statements made by Respondent during the trial of a case arising out of an automobile accident. Respondent represented Danielle Lynn Koziol in her claim against State Farm Mutual Automobile Insurance Company (State Farm) seeking damages for personal injury to her son and property damage to her vehicle caused by a "phantom" driver. On March 20, 1991, a jury trial began in the Circuit Court for Harford County. During Respondent's opening remarks and direct examination of Ms. Koziol, he referred to the phantom driver as an "idiot." In addition, during opening remarks, Respondent made a comment that one can expect to be "jerked around" when dealing with an insurance company. Judge Brennan quoted the following from Respondent's opening statement:

> " 'When you are involved in an automobile accident and it is somebody else's fault and you are dealing with their insurance company, I guess one learns to expect to get jerked around.'

[Defense Counsel]: Objection.

The Court: Sustain the objection.

[Respondent]:

> \* \* \*

> 'Did Miss Koziol cause this accident or did this *idiot* [emphasis added] who stopped in two lanes of rush hour traffic and skidded to a stop, cause this accident?' " (Emphasis supplied by Judge Brennan).

Judge Brennan also wrote that, during Respondent's direct examination of Ms. Koziol, Respondent stated: " 'You were going through the intersection at Allender Road. Tell us where you were and what this *idiot* ahead of you did.' " Defense counsel moved for a mistrial which was granted by the trial court. State Farm later filed a motion for sanctions

against Respondent.[3]

Judge Brennan found that there was clear and convincing evidence that the "[v]arious comments made and actions by the Respondent, Stuart Long Alison, on Tuesday, May 31, 1994, in the case of *Danielle Koziol v. State Farm Insurance* ... caused The Honorable Cypert O. Whitfill to grant a mistrial in the case." Based upon these findings, Judge Brennan concluded that Respondent violated Maryland Lawyers' Rule of Professional Conduct 3.4(e).[4] In reaching this conclusion, Judge Brennan reasoned that:

"It certainly is not fair to the opposing party or to counsel for an attorney to make statements to the jury that the opposing party is an idiot, or that one can expect to be jerked around by the insurance company. In this particular case, the Defendant was an insurance company. The purpose of an opening statement is to tell the jury what you expect to prove at the trial. These remarks were argumentative and only served to inflame the jury."

Judge Brennan also concluded that Respondent violated Rule of Professional Conduct 8.4(d).[5] Judge Brennan reasoned that

---

**3.** The motion was later granted pursuant to Maryland Rule 1–341 (Bad faith—Unjustified proceeding) which provides:

"In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it."

**4.** Rule of Professional Conduct 3.4(e) (Fairness to opposing party and counsel) provides that a lawyer shall not

"in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused."

**5.** Rule of Professional Conduct 8.4 (Misconduct) provides in pertinent part:

"It is professional misconduct for a lawyer to:

Respondent's statements "were the basis for Judge Whitfill granting the mistrial. [Judge Whitfill found that the actions of Stuart Alison were intentional and inappropriate]."

Respondent filed a motion to dismiss arguing that the Inquiry Panel unanimously recommended the dismissal of the charges as to the Koziol matter and that its recommendation should have become final. Respondent also filed exceptions to Judge Brennan's findings, asserting that Respondent never referred to an *opposing party* as an idiot and also never stated that one could expect to be "jerked around" by the Defendant insurance company. Petitioner filed an exception to what it called a factual misstatement that the Inquiry Panel Chairman was dismissed as opposed to being replaced at his own request.

"To be sustained, the findings of fact of a hearing court must be supported by clear and convincing evidence." *Attorney Griev. Comm'n. v. Kemp,* 335 Md. 1, 9, 641 A.2d 510, 514 (1994). Because this Court has original jurisdiction over disciplinary proceedings, we will make an "independent, detailed review of the complete record with particular reference to the evidence relating to the disputed factual finding." *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973). In our independent review of the record, we note that the findings made by the trial court are *"prima facie* correct and will not be disturbed unless clearly erroneous." *Attorney Griev. Comm. v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 474 (1996).

■ In the instant case, we need not address Petitioner's exception and Respondent's arguments concerning the Inquiry Panel. It is also unnecessary for us to determine whether there is a distinction between calling the phantom driver an idiot and calling the opposing party an idiot because the record before us does not provide clear and convincing evidence that Respondent violated Rules of Professional Conduct 3.4(e) and 8.4(d). From the official transcript contained in the

---

(d) engage in conduct that is prejudicial to the administration of justice."

record, it appears that Respondent referred to the phantom driver as an "idiot" once during his opening statement and once during the direct examination of Ms. Koziol. In addition, during his opening statement, Respondent stated that "one learns to expect to get jerked around" when dealing with an insurance company. Although we previously suspended Respondent for violating Rule of Professional Conduct 8.4(d) by using profane and vulgar language in the courtroom and toward district court clerks, see *Attorney Griev. Comm'n v. Alison*, 317 Md. 523, 565 A.2d 660 (1989) (hereinafter *Alison I* ), Respondent's comments in the instant case do not rise to the level requiring discipline. Even though Respondent's conduct does not warrant disciplinary action, we do suggest that Respondent was rather overzealous in his advocacy for his client, and we hasten to add that such remarks by Respondent during a jury trial are not approved by this Court.

## II. Veta McAnulty v. First Virginia Bank–Central, Maryland et al.

The next complaint alleged that Respondent engaged in misconduct in a case arising out of the repossession of an automobile. As part of a marital settlement agreement, Edwin McAnulty promised to purchase a vehicle for his wife, Veta McAnulty. Ms. McAnulty thus contracted with Harco Oldsmobile (Harco) for the sale of a vehicle, informing Harco that Mr. McAnulty would pay for the vehicle. Mr. McAnulty executed an installment sales contract with Harco and financed the vehicle through Commercial Bank, now First Virginia Bank (the Bank). Mr. McAnulty granted the Bank a security interest in the vehicle as collateral for the loan. Shortly after the McAnultys' divorce became final, Mr. McAnulty defaulted on the loan, and the vehicle was repossessed by Harco and sold pursuant to the installment sales contract.

Ms. McAnulty retained Otto Major to represent her in this matter. Mr. Major later had Respondent review, as a paralegal,[6] Mr. Major's draft of a complaint against the Bank, Harco,

---

6. At the time Respondent reviewed the complaint, he was still suspended from the practice of law pursuant to *Alison I, supra*. Respondent's suspension was terminated by this Court on June 28, 1990.

Harco's attorney, and a collection officer who completed paperwork regarding the repossession. Respondent redrafted the complaint which was filed in the Circuit Court for Baltimore City on June 13, 1990. The plaintiff sought over $4,000,-000 in damages, alleging fraud, conversion, violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.,* and conspiracy to commit each count.

The case was subsequently removed to the United States District Court for the District of Maryland. In his findings of fact and conclusions of law, Judge Brennan noted that after the district court indicated that "'there would be a good reason presented for granting Rule 11 Sanctions in a case on which a frivolous RICO claim ... was brought' if the case had originally been brought in" federal court, the RICO claim was voluntarily dismissed by Respondent. Ms. McAnulty's case was then returned to the Circuit Court for Baltimore City and later dismissed by the circuit court with leave to amend upon certain conditions. Respondent drafted and filed an amended complaint omitting the fraud count on May 29, 1991.[7] Upon the defense's motion to strike, the amended complaint was dismissed with prejudice. On appeal, the Court of Special Appeals in an unreported, per curiam opinion held that the circuit court properly dismissed six of the eight counts of the amended complaint. The intermediate appellate court stated that the *McAnulty* case was an attempt "to distort the unremarkable with allegations which are both incredible and outrageous in light of what actually occurred." The intermediate appellate court noted:

"We would be remiss if we did not question the pleadings drafted by [Ms. McAnulty's] counsel. We are aware of, and disturbed by, the numerous misstatements of fact throughout his amended complaint. We quote Judge [John Carroll] Byrnes, who aptly stated, '[Y]ou obviously are quite indifferent to what you say in pleadings, which I think puts you in a special class....'"

---

7. By that point, Respondent's suspension had been terminated.

The defense filed a motion for sanctions, pursuant to Md. Rule 1–341, which was granted as to both Respondent and Mr. Major. Judge Brennan noted that in granting the motion, the circuit court found that Respondent " 'controlled the direction of activities in this case' " and was without " 'a reasonable basis for believing that the claims would generate an issue of fact for the fact finder and therefore lacks substantial justification.' " In addition, the circuit court found that Respondent "led the charge and Mr. Otto [Major] followed his lead." With regard to certain counts, the circuit court found that the attorneys "brought the RICO and fraud counts vexatiously for the purpose of harassing the defendants which in [the court's] view amounts to bad faith under interpretations of Maryland Rule 1–341." Furthermore, the circuit court found that Respondent added the RICO claim "solely to take advantage of the treble damages provision of the RICO statute in order to obtain an exorbitant settlement from the defendants," and the RICO count "amounts to a claim brought in bad faith and without substantial legal or factual justification."

In his written opinion, Judge Brennan stated:

"In assessing sanctions, Judge [Thomas E.] Noel noted that he felt that Stuart L. Alison was more culpable and therefore, the amount of sanctions were fashioned accordingly. There have been no less than four separate reviews by various judges deciding adversely to the Respondent concerning his pursuing this case.

\* \* \*

It is clear from an examination of this case that Stuart L. Alison was the captain of the ship and directed its course from beginning to end. This case was never worth $4,000,-000, but could have been resolved by a Writ of Replevin. Mr. Alison went after deep pockets, hoping to get a settlement from either a bank, an automobile agency, an attorney, or all of them."

Judge Brennan then found by clear and convincing evidence that "the inclusion of a RICO count in the *McAnulty* case was totally without merit. [The United States District Court] was

of the same opinion and would have imposed sanction under Rule 11, if allowed." Based on these findings of fact, Judge Brennan concluded that Respondent violated Rule of Professional Conduct 3.1 [8] stating that: "From a review of this case by the Judges who have been asked to rule on the merits of the various counts, the evidence is overwhelming that Stuart L. Alison engaged in filing these claims, after his actions were ruled upon by Judge Byrnes and Judge Noel." Judge Brennan also concluded that Respondent violated Rule of Professional Conduct 4.4,[9] noting that Ms. McAnulty's suit "was an attempt to get to some deep pockets by using a shotgun approach[ ] and hoping to obtain a good settlement." Finally, Judge Brennan concluded that Respondent violated Rule of Professional Conduct 8.4(d) and that his action, "wherein he included a RICO count in a Complaint that had absolutely no foundation of facts in the hopes of obtaining treble damages[,] is not to be condoned as acceptable practice of law."

In Respondent's motion to dismiss, he argues that the McAnulty charges are barred by nonmutual collateral estoppel because similar charges were filed against Otto Major and later dismissed. Petitioner counters that the doctrine of nonmutual collateral estoppel does not apply. We agree with Petitioner.

The doctrine of nonmutual collateral estoppel "can be invoked offensively or defensively." *Leeds Federal v. Metcalf,*

---

**8.** Rule of Professional Conduct 3.1 (Meritorious claims and contentions) provides:

"A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer may nevertheless so defend the proceeding as to require that every element of the moving party's case be established."

**9.** Rule of Professional Conduct 4.4 (Respect for rights of third persons) provides:

"In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that the lawyer knows violate the legal rights of such a person."

332 Md. 107, 115–16 n. 4, 630 A.2d 245, 249 n. 4 (1993). Respondent attempts to invoke the doctrine defensively. "Defensive use of nonmutual collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue which the plaintiff previously litigated unsuccessfully in another action against a different party." *Id.* The four-part test for applying nonmutual collateral estoppel is:

" '1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?' "

*Leeds Federal,* 332 Md. at 117–18, 630 A.2d at 250 (quoting *Wash. Sub. San. Comm'n v. TKU Associates,* 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977)). Here, the first element of the four-part test has not been met: the issue decided by the Inquiry Panel as to Mr. Major was not identical to the issue presented in the instant case. As we have previously explained, "the proceedings conducted by the Inquiry Panel ... are similar to the proceedings conducted by a grand jury in criminal cases." *Attorney Griev. Comm'n v. Stewart,* 285 Md. 251, 259, 401 A.2d 1026, 1030 (1979), *cert. denied,* 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979). The purpose of the Inquiry Panel is "to aid in determining whether to institute disciplinary action." *Id.* Major's conduct was referring the matter to Alison to draft the pleadings and direct the litigation. Thus, the issue before the Inquiry Panel as to Mr. Major's case may have been whether disciplinary proceedings should be instituted against Mr. Major for not giving proper review to pleadings prepared by Respondent, whereas the issue in the instant case is whether Respondent violated Rules of Professional Conduct 3.1, 4.4, and 8.4(d) in his preparation of the pleadings and his conduct in directing the McAnulty case. As Petitioner noted in its response to Respondent's motion to dismiss, "[i]t certainly can be concluded that the

Inquiry Panel in the Major complaint sought not to hold Major accountable for what were truly the actions of the Respondent herein." We therefore conclude that the defense of nonmutual collateral estoppel does not apply in the instant case.

 Respondent also filed exceptions arguing that the evidence was incompetent in that Judge Brennan's findings were based on the opinions of other judges. Respondent further argues that even if such evidence were admissible, the Clerk of the Circuit Court for Baltimore City was unable to locate the case file and thus the case file was not properly before Judge Brennan. We disagree. In the instant case, it is apparent that Judge Brennan considered the findings contained in Judge Noel's Memorandum and Order, the transcript of the proceedings before Judge Noel, and the opinion of the Court of Special Appeals in the McAnulty case. A certified copy of the docket sheet was also admitted into evidence. Although Judge Brennan quoted extensively from other judges' opinions, Judge Brennan made his own findings of fact and conclusions of law and did not merely adopt other judges' opinions. It was neither improper, nor prejudicial, for Judge Brennan to consider the facts as found by Judge Noel where the case was finally adjudicated. Furthermore, despite the fact that the findings that support sanctions pursuant to Md. Rule 1–341 are determined by a different standard of proof, *i.e.* preponderance of the evidence, than the standard used for findings in support of disciplinary action, *i.e.,* clear and convincing evidence, Respondent's actions were so onerous that there was sufficient evidence for Judge Brennan to find by clear and convincing evidence that Respondent engaged in misconduct in violation of Rules of Professional Conduct 3.1, 4.4, and 8.4(d). This Court does not hold that the imposition of sanctions conclusively establishes the fact of Respondent's misconduct.

In addition, Respondent contends that Judge Brennan failed to comment on Ms. McAnulty's testimony and also Respondent's testimony regarding his investigation of the facts and the RICO statute. The hearing judge, however, "may pick and choose the evidence on which to base his findings," and

Judge Brennan was free to disregard as not credible both Respondent's and Ms. McAnulty's testimony. *Attorney Griev. Comm'n v. Miller,* 301 Md. 592, 603, 607, 483 A.2d 1281, 1287, 1289 (1984). Furthermore, the fact that a witness's testimony was not discussed in the court's findings "does not indicate a failure to consider it." *Miller,* 301 Md. at 606, 483 A.2d at 1289.

### III. Alison v. Toscani, Goodman & Close, et al.

The last complaint against Respondent arises out of a six-count complaint filed on January 18, 1988 by Respondent against the law firm of Toscani, Goodman & Close (the firm), John A. Goodman and James A. Close, individually, and Frank and Patricia Stacey. Respondent asserted that the firm and Mr. Close were liable for malpractice, breach of contract, tortious interference with contract, and slander, claiming $80,-000 in compensatory damages and $150,000 in punitive damages. Respondent also claimed that the Staceys were liable for breach of contract and in *quantum meruit,* alleging $6,000 in compensatory damages. Respondent, however, dismissed his complaint against the Staceys in October 1989. According to the complaint, the Staceys retained Respondent to represent them regarding an automobile accident which occurred in 1985. Respondent claimed that he and Mr. Close shared office space but were not partners, that he hired Mr. Close to assist him with the Staceys' representation, and that Mr. Close failed to represent them properly. As a result, Respondent lost them as clients.

Prior to trial, Respondent filed an amended complaint against the law firm and Mr. Goodman and Mr. Close individually, eliminating the slander count against the firm and replacing it with a breach of fiduciary duty claim. Contrary to what he had asserted in the initial complaint, Respondent claimed that he and Mr. Close were partners with regard to the representation of the Staceys. The defendants moved for summary judgment and to strike the amended complaint, and both were granted by the circuit court. The defendants later moved for sanctions against Respondent pursuant to Md. Rule

1–341. Before the motion for sanctions was ruled upon, Respondent filed a notice of appeal to the Court of Special Appeals which reversed and remanded the case to the circuit court.

On remand, the defendants filed a motion to compel discovery which was granted. Respondent did not comply with the order compelling discovery, and the defendants then filed a motion pursuant to Md. Rule 2–433 requesting that Respondent's case be dismissed. The circuit court dismissed Respondent's amended complaint, but directed the clerk of the court not to file the order until the defendants' previous motion for sanctions could be ruled upon. Respondent filed a motion to alter or amend the judgment, but later failed to appear at the hearing held on that motion. The circuit court denied Respondent's motion.

At the conclusion of a hearing held on the defendants' motion for sanctions, the circuit court delivered an oral opinion granting the motion. Judge Brennan quoted the following from the circuit court's opinion:

> " *'This is a bad faith case.* What I have to do is look to see why you did all of this. What was the reason you sued Close? Why? . . . . It *was a get even. . . . This is a vexatious case. You are out to get Jimmy Close.* You wanted to *harass him. . . .* What you would like is *to beat on* him. You take pleasure in *picking* on him. . . .
>
> The *whole case is without substantial justification. . . .* In this case in my judgment this whole case was born of your anger at Mr. Close and that you were going to get him. It *is vexatious* . . . . you have enjoyed yourself the last couple of days. I have looked out and watched you and you take great pleasure in trying to make Mr. Close *squirm.* No doubt about that. None in my mind. None . . . . it was not the money that you were after. It is his blood. That is what you *want.* Not the money. *You want blood.*
>
> . . . .
>
> Alison says that Close was conspiring to take the client[s] away from him. I find [that] untrue and I do not think that

he [Alison] really thought that back then. *He was mad* that he was out of the case and *he was going to get Close.* So he files this lawsuit. He files it in malpractice (Count I) which is as I said earlier is a ridiculous document.... He [Alison] was just a lawyer on the case who had an agreement with a client and the clients have not sued anybody. He sues for breach of contract (Count II). It is true that Close in all probability could have pursued the Staceys for some monies for the work he performed on the file. He opted not to do that. One of the main reasons he opted not to do it is because Alison is running around saying I am going to sue you. So, he [Close] says I am out of here. He [Alison] sues [Close] for breach of fiduciary duty [Count IV] because he says they were partners. That is ludicrous. They were not partners. They had an agreement. As I said, the only thing that may have had a [shred] of legitimacy to it would have been him to ask Close for the monies from the fee that Close may have been entitled to from the Staceys, but which Close [didn't] get. He [Alison] sues him for interference of contract [Count III]. [He] says that Close had actual knowledge of the contractual relationship between Alison and the Staceys—well, it was Close that had the contractual relationship between the Staceys and him. He was part of that contract. And to argue that he was trying persuade the Staceys not to honor their contract with the Plaintiff [Alison] was *ridiculous.* Whatever Close was going to get he had an agreement which he readily admits by which he had to give Alison half of. So he didn't interfere with the contract ... there is no question in my mind that Mr. Alison was going through then and may be going through now a period when you were with him or getting him, you were going to be *harassed* in some way.... *He did it in my judgment recklessly.* His overriding concern is to get Jimmy Close.

*I find that the case was not only brought without substantial justification, but it has been continued without substantial justification. I believe that Mr. Close is entitled to the fees that he has been charged by Mr. Karas' law*

*firm. I also believe that he is entitled to any costs ...*
*associated with this lawsuit.*

. . . .

*[T]he court finds that the case was brought without*
*substantial justification and continues without substantial*
*justification and in bad faith.*

. . . .

It seems to me that it was *vexatious* and I will state that
for the record. The Court orders fees in the amount of
$6,318 and costs in the amount of $443.91 . . . . [made] pay-
able to Close.' " (Emphasis added by Judge Brennan).
The Court of Special Appeals in an unreported, per curiam
opinion affirmed the circuit court's judgment.

 Judge Brennan found by clear and convincing evidence
that Respondent's action in "dragging the Staceys into this
case ... was completely without merit or justification. Mr.
Alison ultimately dismissed the Staceys as a party in the case
with the comment that 'he didn't want their money but wanted
Jimmy.' "

Judge Brennan also found by clear and convincing evidence
that in a letter dated August 14, 1995, Robert Burchett, the
Panel Chaiman of the Attorney Grievance Commission, re-
quested that Respondent appear for a two-day hearing to be
held sometime between October 1 and November 17, 1995.
Respondent did not respond to this request, and on August 31,
1995 Mr. Burchett notified Respondent that the hearing was
scheduled for November 1 and 2, 1995. On October 26, 1995,
Respondent notified Mr. Burchett in writing that he would not
be able to appear on either November 1 or 2 because of eight
previously scheduled cases, but he did not attempt to obtain a
postponement in any of those cases. Prior to November 1,
Respondent sought an injunction to prevent the hearing, but
this request was denied. Respondent failed to appear at the
hearing.

Based on this evidence, Judge Brennan concluded that Respondent violated Rules of Professional Conduct 3.1, 4.4, 8.4(d), and 8.1(b).[10] Regarding Respondent's violation of Rule of Professional Conduct 3.1, Judge Brennan reasoned that Respondent's claim against the law firm "was completely without foundation, since those attorneys never had a legal relationship with Mr. Alison." In addition, Judge Brennan pointed to the findings by the circuit court and the Court of Special Appeals noting that the remaining counts were found to be "meritless" after Respondent failed to respond to the defendants' motion to dismiss. Judge Brennan further concluded that "[t]his entire case generated a lot of court time, unnecessary pleadings and involvement of parties for the sole purpose of harassing Mr. Close."

As for Rule of Professional Conduct 4.4, Judge Brennan concluded that Respondent "included the Staceys as a party in this case and kept them as such until they offered $1,500 to settle. At that time, he voluntarily agreed to dismiss them stating, 'I don't want your money. I want Jimmy's.' These actions by Respondent had no substantial purpose, other than to unnecessarily burden the Staceys." Judge Brennan also concluded with regard to the violation of Rule of Professional Conduct 8.4(d): "Mr. Alison's use of the legal system and the Baltimore County Circuit Court, in his efforts to obtain revenge against James Close, lacked substantial justification. He also unnecessarily involved the Staceys in this matter for the sole purpose of carrying out this vendetta." Finally, regarding Respondent's violation of Rule of Professional Conduct 8.1(b), Judge Brennan concluded that Respondent's conduct in failing to respond to the Attorney Grievance Commission's request for hearing dates was "totally inexcusable" and that "[h]e chose not to reply until a few days before the hearing, at which time he requested an injunction against

---

10. Rule of Professional Conduct 8.1 (Bar admission and disciplinary matters) provides in pertinent part: "[A] lawyer in connection with ... a disciplinary matter, shall not: * * * (b) ... knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority...."

having the hearing. Such action is nothing more than total arrogance on Respondent's part."

Respondent excepted to Judge Brennan's findings, asserting that the petition for disciplinary action did not complain that Respondent's action against the Staceys was frivolous or improper and thus it was improper for Judge Brennan to make such a finding. We find no merit in this contention. Paragraph 21 of the petition for discipline alleged the following:

> "In October 1989, Respondent dismissed the complaint against the Staceys. He did so without compensation and after rejecting a[n] offer to settle with the Staceys upon receipt of $1,500 from them. In rejecting their offer to settle he said he didn't want their money but rather 'Jimmy's money', meaning James Close."

The petition further alleged that Respondent by his actions, as set forth in the petition, violated Rule of Professional Conduct 3.1 which prohibits a lawyer from bringing a proceeding "unless there is a basis for doing so that is not frivolous." We conclude that the charges set forth in the petition were "sufficiently clear and specific reasonably to inform [Respondent] of any misconduct charged," Md. Rule 16–709c, and that Judge Brennan did not err in his findings as to the Staceys.

In addition, as in the McAnulty case, Respondent asserts that Judge Brennan merely adopted the findings of the circuit court, rather than conducting an independent determination of the merits of the charges against Respondent. For the same reasons we discussed earlier with regard to the McAnulty complaint, we find no merit in Respondent's assertion, and we therefore sustain Judge Brennan's findings as to the Close complaint.

Respondent also claims that Judge Brennan "ignored the plain language of a letter from Mr. Broderick to the Respondent which," according to Respondent, "merely invited a response," and the Respondent "chose not to accept the invitation." We find no merit to this claim. It is clear that Respondent knowingly failed to respond to a lawful demand for information from a disciplinary authority.

Finally, Respondent made the following general exceptions to Judge Brennan's findings of fact and conclusions of law: 1)Petitioner's proof was not restricted to his answers to Respondent's interrogatories; and 2) Respondent was not permitted to act as co-counsel in the instant case. We find no merit in either of Respondent's claims. Regarding the interrogatories, Petitioner was asked to describe each act or omission upon which Petitioner relied to support the petition for disciplinary action as to each complaint. Petitioner responded by describing the Respondent's actions as they were described in the petition for disciplinary action. It is apparent from the record that Respondent actually attempted to limit Petitioner's proof to certain portions of Petitioner's answers to interrogatories. We find no error.

▇ Respondent's final contention that he was not permitted to act as co-counsel in the instant case is also without merit. In *Stewart,* we noted that disciplinary proceedings are not criminal proceedings and that the purpose of a disciplinary proceeding is "to protect the public by determining a lawyer's fitness to practice law." 285 Md. at 258, 401 A.2d at 1029. We further noted that "a lawyer charged with misconduct is not entitled, at any stage of disciplinary proceedings, to all of the constitutional safeguards accorded an accused in a criminal proceeding." *Stewart,* 285 Md. at 258, 401 A.2d at 1029–30. Even a criminal defendant " 'does not have an absolute right to both self-representation *and* the assistance of counsel.' " *Parren v. State,* 309 Md. 260, 265, 523 A.2d 597, 599 (1987)(quoting *United States v. Halbert,* 640 F.2d 1000, 1009 (9th Cir.1981)). Thus, Judge Brennan did not err in refusing to allow Respondent to proceed pro se as well as with counsel.

In sum, we find that Judge Brennan's findings as to the Koziol case were clearly erroneous. As for the McAnulty and Close complaints, we sustain Judge Brennan's findings of fact and conclusions of law.

## SANCTION

▇ We must now determine the proper sanction for Respondent's conduct. It is well settled that "[t]he purpose of

disciplinary proceedings against an attorney is to protect the public rather than to punish the erring attorney." *Attorney Griev. Com'n v. Hamby,* 322 Md. 606, 611, 589 A.2d 53, 56 (1991). The severity of the sanction depends upon the facts and circumstances of the instant case. *Id.* Imposing a sanction protects the public interest "because it demonstrates to members of the legal profession the type of conduct which will not be tolerated." *Id.*

Petitioner recommends that Respondent be disbarred and states that

"Respondent has not learned from his earlier exposure to discipline and the Opinion of this Court in addressing his conduct. While the earlier Opinion attributed 'the conduct with which we are here concerned [to have] its roots in marital discord ( [*Alison,* 317 Md.] at 525, 562[565] A.2d at 661) there is no excuse this time. It would appear that Respondent's character, professional judgment, sense of ethics and fairness is demonstrably lacking and is at the heart of this course of conduct so abhorrent and intolerable in a member of a learned profession."

We agree with Petitioner's characterization of Respondent. As previously mentioned, this is not the first time Alison has been before this Court on a disciplinary matter. *See Alison I, supra.* In *Alison I,* we suspended Alison noting:

"For about two years, respondent, an attorney in Harford County, engaged in a course of professional and private conduct that was inappropriate, rude, vulgar, insulting, occasionally dangerous, and sometimes criminal."

317 Md. at 525, 565 A.2d at 660. Perhaps more relevant to the sanction in the instant case was the trial judge's findings in Respondent's prior disciplinary matter.

"It is clear that each person who became involved in this dispute was viewed by Alison as an enemy and became an object in what appears to have been a campaign of disrespect, abuse and intimidation.... Harassment was the order of the day."

*Alison I,* 317 Md. at 532, 565 A.2d at 664. We further noted that "it is more than a little disturbing to us that, even at this late date, respondent has little or no appreciation of the seriousness of his transgressions." *Id.* Respondent to this day has very little or no appreciation of the seriousness of his misconduct and has continued to engage in a pattern of harassing conduct. Such a pattern of behavior demonstrates Respondent's inability to conform his conduct within the bounds of the Maryland Lawyers' Rules of Professional Conduct. This Court cannot tolerate Respondent's behavior and his continued refusal to accept responsibility for his actions, especially in light of the fact that this Court previously imposed a ninety-day suspension for violations of Rules of Professional Conduct 4.4 and 8.4(d).

For the violations found in the McAnulty and Close cases, and in light of Respondent's previous suspension, we therefore conclude that the appropriate sanction to impose upon Respondent is an indefinite suspension from the practice of law. Respondent may reapply for admission after two years from the effective date of the suspension. This suspension shall begin thirty days from the filing of this opinion.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715c, FOR WHICH JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST STUART L. ALISON; SUSPENSION SHALL COMMENCE 30 DAYS FROM THE FILING OF THIS OPINION.**