760 A.2d 706

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Steven R. COHEN.

Misc. AG No. 50, Sept. Term, 1999.

Court of Appeals of Maryland.

Oct. 11, 2000.

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel for the Attorney Grievance Com'n of Maryland, for petitioner.

Steven Robert Cohen, Frederick, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Bar Counsel, on behalf of the Attorney Grievance Commission (AGC), petitioner, and at the direction of the Review

Board, filed a Petition for Disciplinary Action with this Court against Steven Robert Cohen, Esquire, respondent,[1] pursuant to Maryland Rule 16–709. In the Petition, Bar Counsel alleges violations of Rules 1.1, 1.3, 1.4, 1.5, 8.1, and 8.4 of the Maryland Rules of Professional Conduct (MRPC), based on two complaints filed against respondent. This Court referred the matter to Judge Mary Ann Stepler of the Circuit Court for Frederick County to conduct an evidentiary hearing in accordance with Maryland Rule 16–709(b). An evidentiary hearing was conducted on April 26 and 27, 2000, and an Opinion and Order with findings of facts and conclusions of law was filed on June 21, 2000, in accordance with Maryland Rule 16–711(a). Judge Stepler found by clear and convincing evidence that respondent violated MRPC 1.1, 1.3, 1.4, 8.1(a), and 8.4(c) and (d).[2] Pursuant to Maryland Rule 16–711, respondent filed exceptions to the findings of fact made by Judge Stepler. We have independently examined the record and the trial court's findings. Based upon that review, we hold that the court's findings of facts and proposed conclusions of law are supported by the record in this case. Accordingly, we overrule respondent's exceptions. We shall suspend respondent indefinitely, granting him permission to apply for readmission after six months.

## I. Facts

As stated, *supra*, this disciplinary action arose out of two complaints. One complaint was filed by Yvonne Crespo, a client that respondent was representing in a custody case. The second complaint was filed by the Honorable Duncan W. Keir after respondent had appeared before Judge Keir representing clients in two separate bankruptcy proceedings.

---

1. Mr. Cohen was admitted to the Bar of this Court in September of 1981.

2. Prior to review by Judge Stepler, the AGC withdrew the allegation of a violation of MRPC 1.5 (Fees).

BC Docket No. 98–22–11–6
Complaint of Yvonne Crespo

There is evidence in the record, and Judge Stepler found that, on or around July 20, 1996, Ms. Crespo received a letter from an attorney representing Jaymes A. Hall, the father of her minor child, which informed Ms. Crespo that an ex parte emergency relief hearing was scheduled in the Circuit Court for Frederick County for July 25, 1996. Along with the letter, Ms. Crespo also received a Motion for Ex Parte Temporary Custody, a proposed Ex Parte Order granting immediate custody, a Petition for Emergency Custody, and a financial statement of Jaymes Hall.

Ms. Crespo's mother and brother selected respondent out of the telephone book and made an appointment for Ms. Crespo. At her initial meeting with respondent on July 23, 1996, Ms. Crespo gave respondent the documents she received in the mail, and a retainer fee of $1,590.00. During the initial meeting, respondent contacted counsel for Mr. Hall to negotiate a settlement.

Respondent and counsel for Mr. Hall negotiated a Consent Order on July 26, 1996. Before the Consent Order was presented to the Circuit Court for Frederick County, however, the circuit court, on July 26, 1996, had already denied the ex parte relief requested by Mr. Hall.[3] The Consent Order was executed by the Honorable G. Edward Dwyer, Jr., on July 31, 1996. The Consent Order restricted Ms. Crespo's custodial rights and her right to travel outside of the jurisdiction.[4] Ms.

---

**3.** Ms. Crespo was not informed that the ex parte relief requested was denied until the later investigation by Bar Counsel.

**4.** The Consent Order stated that:

The parties by and through their attorneys, agree that the Plaintiff, Mr. Hall will not execute any custody order provided that the minor child does not leave this court[']s jurisdiction until all the issues are resolved.

Crespo testified that prior to the Consent Order being signed, she informed respondent that she intended to travel to Florida with the minor child. Respondent incorrectly explained to Ms. Crespo that the Consent Order only restricted her ability to travel outside the United States. As discussed *supra*, note 8, the language of the Consent Order clearly states otherwise. The consent order, to which she agreed, restricted her ability to travel outside the State of Maryland.

Even though Mr. Hall's request for ex parte relief had been denied, respondent filed an answer to it on August 15, 1996. Thereafter, the respondent took no action in Ms. Crespo's case and had no further contact with Ms. Crespo, despite her leaving numerous messages at his office. Frustrated with her inability to contact respondent, Ms. Crespo, asked her brother, Antonio Crespo, to help her contact respondent. In December, 1996, Mr. Crespo went to respondent's office without an appointment and asked respondent for an explanation as to why he was not returning Ms. Crespo's phone calls. Respondent was apologetic and promised to be more attentive.

Thereafter, on January 21, 1997, respondent filed a counter complaint against Mr. Hall, on behalf of Ms. Crespo. Respondent then erroneously filed a Motion for Default Judgment against Mr. Hall on April 1, 1997. Mr. Hall had obtained new counsel and, on March 17, 1997, respondent had granted Mr. Hall's new counsel a thirty-day time extension to file an answer to the counter complaint. Respondent stated that he forgot he had granted the time extension to opposing counsel and respondent entered a stipulation vacating the Motion for Default Judgment. Mr. Hall's attorney filed an answer to the counter complaint on April 17, 1997.

Respondent then began new negotiations with opposing counsel. Respondent, without Ms. Crespo's knowledge, negotiated with opposing counsel about an overnight visit between Mr. Hall and the minor child. A meeting with both attorneys

---

That the Defendant, Yvonne Crespo, hereby agrees not to leave the jurisdiction of this court and if she does she will waive her right to contest the signing of the Ex–Parte Custody Order.

and both parties was arranged but respondent never informed Ms. Crespo. She found out about the meeting from the opposing party, Mr. Hall. Ms. Crespo tried to contact respondent about the meeting by telephone, but she did not receive a return phone call. Ms. Crespo again relied upon her brother, Mr. Crespo, to contact respondent. Mr. Crespo then went to respondent's office without an appointment and asked respondent why he was not returning his sister's phone calls and why she was not being kept informed of the status of her case. Respondent stated that he had sent Ms. Crespo a letter. At the disciplinary hearing, Ms. Crespo testified that she never received any such letter from respondent.

Ms. Crespo then sought substitute counsel. Ms. Crespo discharged respondent on or around May 20, 1997, and requested her file and a refund of unearned fees. On May 27, 1997, respondent's appearance was withdrawn and a new counsel entered his appearance.

The AGC received a disciplinary complaint from Ms. Crespo on July 21, 1997, at which time Ms. Crespo still had not received a refund of unearned fees. Respondent was placed on notice of the complaint by a letter dated August 1, 1997. Respondent sent a letter dated August 13, 1997, to the AGC stating that he had returned a refund to Ms. Crespo. The AGC received a letter from Ms. Crespo on September 11, 1997, stating that she had not received a refund from respondent. The AGC then assigned the case to John W. Reburn, Bar Counsel Investigator.

Bar Counsel contacted respondent on October 28, 1997 to schedule a meeting, which occurred on December 8, 1997. Bar Counsel also faxed to respondent the letter received from Ms. Crespo on September 11, 1997, which stated that she had not received a refund from respondent. In November, six months after respondent had been discharged and three months after respondent had sent a letter to the AGC stating that the refund had already been sent, Ms. Crespo finally received a refund of $470.00 from respondent. Respondent testified that he was the only person in his office with the

signatory power over escrow accounts. Respondent also testified that he did not know the refund was not sent to Ms. Crespo until he was contacted by Bar Counsel. Respondent had no explanation for why he had stated in August 1997, that he had sent the refund.

Respondent testified that he never received any telephone messages from Ms. Crespo. However, respondent's secretary, Dawn Kretchmyer, testified that Ms. Crespo called the office frequently for information about her case. Respondent testified that he sent letters to Ms. Crespo, however, Ms. Crespo testified that she had not received any letters from respondent. Bar Counsel testified that upon reviewing respondent's file, respondent had the wrong address on the file and on the billing statements.

Ms. Crespo's file in respondent's office also included his activity logs. Her file had three separate activity logs that appeared to be kept in a disorganized and haphazard manner. One activity log had entries from May 14, 1996 and July 3, 1996, long before respondent had been retained by Ms. Crespo. Ms. Crespo was not served the original papers in this case until approximately July 20, 1996, and she did not retain respondent until July 23, 1996. Therefore, the entries could not be applicable to Ms. Crespo and could not have been entered as work completed on Ms. Crespo's behalf.

Based upon the aforementioned findings of fact, Judge Stepler concluded that respondent violated the following in his representation of Ms. Crespo:

1. Respondent violated MRPC 1.1 (Competence), in that he lacked the "thoroughness and preparation necessary" in order to faithfully represent Ms. Crespo;

2. Respondent violated MRPC 1.3 (Diligence) through his failure to keep Ms. Crespo apprized of her case;

3. Respondent violated MRPC 1.4 (Communication) through his pervasive failure to inform Ms. Crespo of the status of her case;

4. Respondent violated MRPC 8.1(a) (Bar admission and disciplinary matters) by stating in a letter to the Attor-

ney Grievance Commission that he had refunded all unearned fees to Ms. Crespo when the refund had not been sent;

5. Respondent violated MRPC 8.4(c) (Misconduct) when he made false representations to Ms. Crespo and Bar Counsel about having refunded all unearned fees;

6. Respondent violated MRPC 8.4(d) (Misconduct) by directly misleading the AGC about having sent a refund to Ms. Crespo when respondent had not sent the refund. She also found that respondent's careless business practices, failing to keep a contemporaneous activity log, also violated 8.4(d).

### BC Docket No. 98–199–11–6
### Complaint of the Honorable Duncan W. Keir[5]

Judge Keir contacted the AGC about two cases in which respondent had appeared before him.

### A.  Ashley Case

There is evidence in the record that, and Judge Stepler found that, respondent was retained by Robin and Kerry Ashley to represent the Ashleys in a bankruptcy case. The Ashleys were seeking bankruptcy protection because they were several months in arrears on their mortgage payments and there was a dispute with the mortgage company as to how much money the Ashleys actually owed. The Ashleys had not filed state or federal income tax returns for the years 1992 through and including 1996. The Ashleys also had other debts.[6]

On May 1, 1997, respondent, on behalf of the Ashleys, filed a Voluntary Petition for Bankruptcy Protection under Chapter 13. As required by the bankruptcy rules, respondent then

---

5. Judge Keir is a Judge in the United States Bankruptcy Court for the District of Maryland.

6. According to Schedule F of the Petition for Bankruptcy Protection, the Ashleys owed $6,301.69 to Frederick Memorial Hospital and $3,246.93 to Hecht's.

filed a Chapter 13 plan within fifteen days. A combined notice, dated June 13, 1997, was sent to respondent and the Ashleys notifying them of the section 341 Creditors' Meeting scheduled for July 11, 1997, and the plan confirmation hearing scheduled for July 22, 1997. Respondent did not receive this notice directly as it was mailed to his previous address. Mrs. Ashley testified, however, that she dropped off a copy of the combined notice at respondent's office when she received it in the mail. Respondent testified that upon receiving the combined notice from Mrs. Ashley, respondent faxed a request on July 11, 1997 to the U.S. Trustees to continue the section 341 Creditors' Meeting.

On July 22, 1997, respondent and the Ashleys attended the scheduled plan confirmation hearing. The Trustee, Thomas Lackey, instead held the section 341 Creditors' Meeting and requested a continuance of the plan confirmation hearing. The continuance was granted and the plan confirmation hearing was rescheduled for September 11, 1997. By a Trustee Report filed on July 22, 1997 and a Trustee's Proceeding Memo filed on July 24, 1997, respondent was given notice that the Ashleys were required to make escrow payments as required under the Bankruptcy Code, make sure that there was not any post-petition arrearage to any secured creditor, make sure that all tax returns due to Federal and State authorities were filed and copies were provided to the Trustee, and provide income verification and valuation for the real property of the Ashleys within thirty days.

The plan confirmation hearing was held on September 11, 1997 before Judge Keir.[7] At the hearing on the Petition for Disciplinary Action, Mrs. Ashley testified that respondent had not provided the Ashleys with a copy of the Trustee Report prior to the hearing. Respondent had told the Ashleys that he would meet with them forty-five minutes before the meeting to prepare them for the meeting, however, respondent was late,

---

7. The following people were present at the hearing: the Ashleys; respondent; Thomas Lackey, Trustee; and, James Wilkinson, Tax Division for the United States Internal Revenue Service.

apparently due to a flat tire. Therefore, respondent did not have the opportunity to properly inform the Ashleys about the hearing. Mr. Lackey, Trustee, testified at the plan confirmation hearing that since the plan was filed, three plan payments had been due and Mr. Lackey had not received any payments.[8] Mr. Lackey also testified that the Ashleys' income tax returns still had not been filed and that Mr. Lackey had not received verification of the Ashleys' income and the valuation for the real property. Mr. Lackey also testified that the claim of First Union Mortgage had been an allowed claim and was for $15,000.00. Respondent failed to file an exception to the $15,000.00 claimed by First Union Mortgage, even though the Ashleys claimed to owe only $10,000.00. Mr. Wilkinson objected to the submitted plan because the plan did not include a provision to pay a secured claim held by the United States. The Bankruptcy Code[9] requires that secured claims be specifically identified in the plan and the secured claim of the IRS for unpaid taxes, penalty, and interest due was not

**8.** At the hearing on the Petition for Disciplinary Action, Judge Keir testified that when a plan is filed, the debtor is required to begin making plan payments one month after the filing, so the payments begin before the confirmation hearing. Respondent stated at the confirmation hearing that the Ashleys had two payments with them that day. Mrs. Ashley testified at the hearing on the Petition for Disciplinary Action that she had requested from respondent the address where she should send the payments. Mrs. Ashley testified that respondent told her to just bring the payments to the plan confirmation hearing on September 11.

**9.** 11 U.S.C.S. § 1325, Bankruptcy Code, states:
(a) Except as provided in subsection (b), the court shall confirm a plan if—
. . . .
(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder. . . .

identified. Respondent stated that he would make sure that the tax returns were filed and that of the three delinquent plan payments, two payments would be made that day.

Judge Keir, at the conclusion of the September 11, 1996 hearing, ordered that "the plan[, as] presently on file[, is] denied confirmation with leave to amend on or before ... October 13th. Hearing upon any amended plan will be November 13th at 3:15 p.m. The Court further notes that no further postponements will be granted in this case." Judge Keir filed an Order Denying Confirmation of Chapter 13 Plan With Leave to Amend on September 12, 1997.

The IRS filed a Motion for an Enlargement of Time in Which to File an Amended Proof of Claim on October 1, 1997, because they had not received the tax returns. Judge Keir granted the motion without a hearing.

On October 10, 1997, the Ashleys filed a debtors' certificate, which was required by the plan to show that the requirements of the plan were being satisfied by the Ashleys. The certificate, which was filed under the pain and penalty of perjury, showed the payments that had been made to First Union Mortgage and it also was marked that the Ashleys had filed all federal and state income tax returns. Mrs. Ashley testified, at the hearing on the Petition for Disciplinary Action, that when she picked up the debtors' certificate from the respondent's office, the certificate was blank except for an "X" where the Ashleys were supposed to sign. Dawn Kretchmyer, respondent's secretary, testified that she typed in the information on the certificate about the Ashleys' payments to First Union Mortgage but did not mark the "X" indicating that all federal and state income tax returns had been filed. Respondent, or someone in his office, marked that the federal and state income tax returns had been filed.

The hearing on confirmation of the amended plan convened before Judge Keir on November 13, 1997.[10] At the hearing,

---

10. The following people were present at the hearing: the Ashleys; respondent; David Katinsky, representing the IRS; and, Mr. Lackey, Trustee.

Mr. Lackey stated that although the Ashleys were current on their payments under the plan, he had not seen the state tax returns. Mr. Lackey also stated that the plan was underfunded to cover all of the disbursements that the Ashleys intended to put in their plan.

After Mr. Lackey addressed the court, Judge Keir turned his attention to the debtors' certificate that was filed on October 10, 1997. The certificate, signed under penalty of perjury, stated that all federal and state income tax returns had been filed. Judge Keir, concerned that false testimony had been presented to the court, questioned Mrs. Ashley and respondent about the circumstances surrounding the filing of the certificate. Mrs. Ashley stated to Judge Keir that she gave the completed tax returns from H & R Block to respondent, along with pre-addressed envelopes. The Ashleys signed the debtors' certificate on the advice of respondent[11] and in reliance on respondent's promise to file the tax returns.

Judge Keir then questioned respondent as to the location of the missing federal and state income tax returns. Respondent, during the hearing, *had looked in his briefcase and found the originals of the federal income tax returns, the Ashleys' W-2, and the pre-addressed envelopes.* Respondent claimed that the tax returns were probably placed in his file by one of his employees and he was unaware that the returns were still in his possession.

Respondent was confused at the hearing about what the order from September 12, 1997 required him to have done. He thought he did not have to file an amended plan prior to October 13, 1997, even though it was stated in the order from September 12, 1997. The clerk's office had attached an order to dismiss for respondent's failure to amend, however, Judge Keir had not executed the order. If the order had been signed, the Ashleys would have lost their ability to file for bankruptcy protection and could have possibly lost their home

---

11. At the hearing, respondent stated to Judge Keir that he told the Ashleys to sign the debtors' certificate under the assumption that the tax returns had been filed by H & R Block.

through foreclosure. Respondent stated to Judge Keir that he thought the missing documentation was all that was needed by October 13th, 1997.

Judge Keir then stated that he was going to amend the court's previous order allowing the Ashleys an extended period of time to amend the plan. The court did not think that the problems, which were before the court were caused by the debtors, and Judge Keir stated that he did not want to punish them for the errors of respondent. Judge Keir also told the Ashleys that if they wished to change counsel, he would order the fee paid to respondent to be immediately refunded to the Ashleys so they could hire new counsel. The Ashleys stated that they would like new counsel. Judge Keir ordered respondent to refund any fee to the Ashleys. Judge Keir ordered that an amended plan would be due on or before December 27, 1997.

At the hearing on the Petition for Disciplinary Action, Mrs. Ashley testified that following the September 11, 1997 hearing, she kept a log of her contacts with the respondent and his office because of the Ashleys' frustration with respondent's performance and their concern with his appearance and ability. Mrs. Ashley's log indicated that she left thirty-one telephone messages for the respondent from September 29 through November 12, 1997. They were unanswered.

Respondent testified, at the disciplinary hearing, that he had not received a copy of Judge Keir's order from September 12, 1997. However, John Reburn, Bar Counsel Investigator, testified that he found that order in respondent's client file. Respondent testified that his office received the state and federal tax returns and mailed them to proper authorities, however, neither set of returns were properly filed by the time of the confirmation hearing on November 13, 1997. Respondent also testified that he sent letters to the Ashleys updating them about the case, Mrs. Ashley testified that the Ashleys never received the letters. Even though respondent claims not to have received Judge Keir's order of September 12, 1997, respondent's personal calendar had the notation, "dead-

line Ashley," on the date of October 13, 1997.[12] Respondent testified that the notation just meant that he had to have certain documents to Mr. Lackey by or on that date. Respondent sent a letter on October 3, 1997 to the Trustee, Mr. Lackey, indicating that the Ashleys' tax returns for the years 1992 to 1997 were enclosed with the letter. At the confirmation hearing on November 13, 1997, Mr. Lackey stated to Judge Keir that he had not yet received the state tax returns.

## B. Zeppatella Case

There is evidence in the record that, and Judge Stepler found that, on October 17, 1994, respondent filed a petition for bankruptcy protection on behalf of Ferdinando Zeppatella. Respondent filed a request to convert Mr. Zeppatella's case from a Chapter 13 to a Chapter 7 bankruptcy action on March 13, 1998. The clerk's office filed a deficiency notice because respondent had not included a $15.00 fee with the request. After the deficiency was cured, Judge Keir signed an order converting the case to Chapter 7. On March 30, 1998, a Trustee was appointed in the Chapter 7 proceeding to take possession of all non-exempt assets and liquidate those assets and further distribute the proceeds to creditors after approval by the court.

On October 21, 1998, Mr. Zeppatella sent a letter to Judge Clifford White requesting the court to convert his bankruptcy case back to a Chapter 13 from a Chapter 7. In his letter, Mr. Zeppatella wrote that, "[a] decision of my lawyer to switch my case from [C]hapter 13 to [C]hapter 7, without the logical explanations, has resulted in a financial disaster for me, with the loss (confiscation) of all my savings, which originate from my pension fund." The court treated this letter as a Motion to Re-Convert Case and a hearing was set for November 12, 1998. At the hearing, Merrill Cohen, Trustee, argued that Mr. Zeppatella's assets were not exempt as retirement benefits and the court agreed.

---

**12.** At the plan confirmation hearing on September 11, 1997, Judge Keir directed that the plan be amended on or before October 13, 1996.

After the hearing, Judge Keir sent a letter, dated November 13, 1998, to John Reburn, Bar Counsel Investigator. In the letter, Judge Keir expressed concern about respondent's representation of Mr. Zeppatella, specifically, that respondent failed to list any exemptions on Schedule C of Mr. Zeppatella's original Chapter 13 petition and on Mr. Zeppatella's motion to convert from Chapter 13 to Chapter 7. When the case was converted to Chapter 7, the Trustee was able to exhaust all assets, leaving Mr. Zeppatella with nothing as a result of there being no exemptions listed on Schedule C. These assets included a $30,000.00 bank account and additional assets on Schedule B in the amount of $56,850.00.

Respondent failed to amend Mr. Zeppatella's Schedule C for over three years. Even while making an amendment to schedule assets to unsecured claims on March 30, 1999, respondent failed to amend Schedule C, thereby depriving Mr. Zeppatella of the minimal amount of exempt property guaranteed to all debtors under federal law. It even took respondent over six months to amend the Schedule C after his knowledge of the proceedings brought against him by Bar Counsel.

### C. Judge Stepler's Conclusions

Based upon the aforementioned findings, which findings were supported by the evidence before her, Judge Stepler concluded that respondent violated the following in his representation of both bankruptcy cases:

1. Respondent violated MRPC 1.1 (Competence) through his failure to apply and grasp basic and fundamental areas of bankruptcy law that were essential to faithfully represent both the Ashleys and Mr. Zeppatella. Respondent also demonstrated a lack of thoroughness and preparation by failing to have the Ashleys' tax returns properly filed.

2. Respondent violated MRPC 1.3 (Diligence) through his repeated failure to return telephone calls to Mrs. Ashley, failing to file the Ashleys' tax returns, failing to pay a court fee that initially prevented the processing of Mr. Zeppatella's motion, and by claiming to have sent vari-

ous letters to the Ashleys, the Trustee, and to taxing authorities which were not received by any of the parties.

3. Respondent violated MRPC 1.4 (Communication) by failing to keep the Ashleys reasonably informed about the status of their case. Respondent also failed to keep Mr. Zeppatella informed, as evidenced by Mr. Zeppatella's letter to the court seeking reconsideration of the conversion from Chapter 13 to Chapter 7.

4. Respondent violated MRPC 8.4(d) (Misconduct) by not filing the Ashleys' tax returns despite indicating to the court, and on the debtors' certificate, that the Ashleys had filed their tax returns.

## II. Discussion

As we stated in *Attorney Grievance Commission v. Sheridan*, 357 Md. 1, 17–18, 741 A.2d 1143, 1152 (1999):

[T]his Court has original jurisdiction over all attorney disciplinary proceedings. The responsibility to make final determinations of an attorney's alleged misconduct is reserved to us. *See* Md. Rule 16–709. As to disputed findings of fact made by Judge Nolan, " 'we [make] an independent, detailed review of the complete record with particular reference to the evidence relat[ed] to the disputed factual finding.' " In reviewing the record, however, this Court adheres to the fundamental principle that the factual findings of the assigned judge in an attorney disciplinary proceeding "are *prima facie* correct and will not be disturbed on review unless clearly erroneous." This means that we will not tamper with the factual findings if they are grounded on clear and convincing evidence. We also keep in mind that it is elementary that the judge "may elect to pick and choose which evidence to rely upon." Such deference is paid, in part, because she is in the best position to assess first hand a witness's credibility. We add, however, that "an attorney in a disciplinary proceeding need only establish factual matters in defense of an attorney's position by

the preponderance of evidence, including whether mitigating circumstances existed at the time of the alleged misconduct." [Alterations in original.] [Internal citations omitted.]

### Respondent's Exceptions

The trial court found that respondent was in violation of MRPC 1.1, 1.3, 1.4, 8.1(a), 8.4(c), and 8.4(d) in his representation of Ms. Crespo and in violation of MRPC 1.1, 1.3, 1.4, and 8.4(d) in his representation of the Ashleys and Mr. Zeppatella. Respondent excepts to various findings of fact of the trial court but does not directly except to her conclusions of law. After an independent, extensive review of the record, we conclude that Judge Stepler's findings of fact are not clearly erroneous and are supported by clear and convincing evidence as is evident from our discussion, *supra*, of the evidence before Judge Stepler. We find that respondent has failed to establish facts by a preponderance of evidence sufficient to overcome Judge Stepler's findings.

### III. Suspension

Regarding the proper sanction to be imposed, we said recently in *Attorney Grievance Commission v. Franz*, 355 Md. 752, 760–61, 736 A.2d 339, 343–44 (1999):

It is well-settled that the purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney. The public interest is served when this Court imposes a sanction which demonstrates to members of the legal profession the type of conduct that will not be tolerated. By imposing such a sanction, this Court fulfills its responsibility "to insist upon the maintenance of the integrity of the Bar and to prevent the transgression of an individual lawyer from bringing its image into disrepute." Therefore, the public interest is served when sanctions designed to effect general and specific deterrence are imposed on an attorney who violates the disciplinary rules. Of course, what the appropriate sanction for the particular misconduct is, in the public interest, generally depends upon

the facts and circumstances of the case. The attorney's prior grievance history, as well as facts in mitigation, constitutes part of those facts and circumstances. [Internal citations omitted.]

Bar Counsel recommends that respondent be disbarred. Bar Counsel states that respondent has evidenced an alarming pattern of incompetence, a lack of diligence, and a lack of communication with his clients. Respondent was also the recipient of a private reprimand in BC Docket No. 96-168-11-6 on January 29, 1999. In that case, the Review Board determined that respondent violated MRPC 1.3.

Respondent proffers that "if this Court feels that the rules of disciplinary conduct were violated, disbarment is not the appropriate remedy." Respondent contends that there was no intentional misleading, that respondent was just unorganized and failed to fully investigate the issues with his clients, the courts, and the Attorney Grievance Commission. Respondent does not suggest what would be an appropriate penalty.

In *Attorney Grievance Commission v. David*, 331 Md. 317, 323-24, 628 A.2d 178, 181 (1993), we suspended an attorney indefinitely from the practice of law because the attorney's representation of four clients was marked by serious neglect and inattention; he "failed to return a fee which was unearned for a period of nine months; he failed to timely remit funds he received on behalf of a client; he failed to communicate with his clients; and in connection with the investigation of three of the complaints, [he] failed to answer Bar Counsel's requests for information." *Id.* We granted him the right to apply for reinstatement after the suspension had been in effect for six months.

In *Attorney Grievance Commission v. Brown*, 353 Md. 271, 725 A.2d 1069 (1999), the attorney was found to have violated MRPC 1.3, 1.4, 3.3, 5.5, 7.1, 7.5, 8.1, and 8.4. The trial court determined that since the ethical violations had occurred, the attorney "ha[d] reduced his case load since the complaints were filed, sought a mentor on case management procedures through the National Bar Association, changed his office mail-

ing procedures, and sought counseling for his 'tendencies' to procrastinate." *Id.* at 296, 725 A.2d at 1081. Despite the mitigating factors, this Court determined that an indefinite suspension with the right to apply for readmission in one year was appropriate.

In *Attorney Grievance Commission v. Alison*, 349 Md. 623, 709 A.2d 1212 (1998), the grievance arose out of three separate complaints filed against the attorney. We determined that the attorney, through his filing of a frivolous claim and his refusal to respond to the Attorney Grievance Commission, had violated MRPC 3.1, 4.4, 8.1, and 8.4. We were also disturbed by the attitude of the attorney as we stated:

> Respondent to this day has very little or no appreciation of the seriousness of his misconduct and has continued to engage in a pattern of harassing conduct. Such a pattern of behavior demonstrates Respondent's inability to conform his conduct within the bounds of the Maryland Lawyers' Rules of Professional Conduct. This Court cannot tolerate Respondent's behavior and his continued refusal to accept responsibility for his actions, especially in light of the fact that this Court previously imposed a ninety-day suspension for violations of Rules of Professional Conduct 4.4 and 8.4(d).

*Id.* at 644, 709 A.2d at 1222. This Court held that the attorney would be indefinitely suspended with the right to apply for readmission after two years.

In *Attorney Grievance Commission v. Mooney*, 359 Md. 56, 753 A.2d 17 (2000), we found that an attorney violated MRPC 1.1, 1.3, 1.4, 5.1, 5.3, and 8.4. We suspended the attorney indefinitely, with permission to apply for readmission after ninety days subject to the attorney engaging a monitor acceptable to Bar Counsel. We found that the attorney's representation of four clients was marred by a failure of the attorney to appear in court, a serious lack of communication, a failure to file appropriate motions, a lack of competence, a failure to properly manage the attorney's office staff, and a failure to properly subpoena witnesses and obtain records.

Respondent violated MRPC 1.1, 1.3, 1.4, 8.1(a), and 8.4(c) and (d). Consistent with *David, Brown, Alison* and *Mooney*, we find an indefinite suspension to be the appropriate penalty. We order that respondent may apply for readmission to the Maryland Bar six months from the effective date of his suspension, which shall commence thirty days after this opinion is filed.

IT IS ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST STEVEN ROBERT COHEN.