762 A.2d 950

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Dushan S. ZDRAVKOVICH.**

**Misc. (Subtitle AG) No. 8, Sept. Term, 1999.**

Court of Appeals of Maryland.

Dec. 4, 2000.

2

4

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel for the Atty. Grievance Com'n of Maryland, for Petitioner.

Dushan S. Zdravkovich, Riva, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

Pursuant to Maryland Rule 16–709(a)[1], Bar Counsel, on behalf of the Attorney Grievance Commission (AGC) (Petitioner), and at the direction of the Review Board, filed a petition with this Court for disciplinary action against Dushan S. Zdravkovich, Esquire (Respondent). In this petition, Bar Counsel asserted four complaints alleging violations of Rules 1.1 (competence), 1.3 (diligence in representation), 1.4 (communication with clients), 1.5 (fees), 1.15 (safekeeping property), 1.16 (declining or terminating representation), 3.1 (meritorious claims and contentions), 8.1 (disciplinary matters), and 8.4 (misconduct) of the Maryland Rules of Professional Conduct (MRPC), and Md.Code (1992, 1998 Repl.Vol.), § 10–306 of the Business Occupations and Professions Article (misuse of trust money). This Court referred the matter to Judge Pamela R. North of the Circuit Court for Anne Arundel County to conduct an evidentiary hearing and make findings of fact and conclusions of law in accordance with Maryland Rules 16–709(b)[2] and 16–711(a).[3]

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Rule 16–709(a) states that "[c]harges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board."

2. Rule 16–709(b) states that the "Court of Appeals by order may direct that the charges be transmitted to and heard in any court and shall

## I.

Of the four complaints lodged against Respondent, two were voluntarily dismissed by Petitioner at the hearing before Judge North on 19 October 1999 due to insufficient evidence.[4] After the evidentiary hearing addressing the remaining two unrelated claims, Judge North found, by clear and convincing evidence, that Respondent violated MRPC 1.1, 1.3, 1.4, 1.5(a), 3.1, 8.4(a), and 8.4(d) during his attorney-client relationship with complainant Val Weaver.[5] Respondent, who has appeared *pro se* throughout these proceedings, filed with us extensive exceptions to the findings of fact and conclusions of law made by Judge North. Petitioner, who does not take any exceptions to the findings of fact and conclusions of law, recommends that we suspend indefinitely Respondent from the practice of law for his misconduct.

From the evidentiary record below, Judge North made the following findings of fact pertaining to Respondent's conduct regarding Val Weaver:

### A. *General Background*

1. Respondent was admitted to practice law in the State of Maryland on 3 November 1981. He is also a member of the bar for the District of Columbia and the former Yugoslavia.

designate the judge or judges to hear the charges and the clerk responsible for maintaining the record in the proceeding."

3. Rule 16–711(a) states that "[a] written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

4. The four complaints brought against Respondent by Bar Counsel involved four of Respondent's former clients: Val Weaver, Leslie Dean Brown, Darlene Clark, and Brian K. Hinds. The Hinds and Clark complaints were dismissed by Bar Counsel, leaving to Judge North to consider only the Brown and Weaver matters.

5. Judge North also found Respondent did not violate any rules of professional conduct regarding his attorney-client relationship with Brown.

2. The conduct in question arose out of Respondent's representation of Val Weaver and James Impero during litigation filed by North American Technologies Group, Inc. (NATG). At that time, Respondent and Weaver had known one another on a professional and personal level for over 20 years.[6] Weaver and Impero had enjoyed a professional and personal relationship for 12 years.

3. During his affiliation with NATG, Weaver was responsible for business developments and was a corporate liaison with government agencies and military services. Although referred to by NATG as Vice President of Marketing, Weaver maintains he was an independent consultant.

4. Impero is a bio-chemist who was employed by NATG as a director and an officer of the company.

5. During the dispute, NATG attached Impero's belongings and locked him out of his office. On 23 January 1995, Impero executed a letter of resignation and a letter of understanding with NATG without the benefit of counsel. Impero did not obtain counsel until 10 February 1995, when a Texas law firm informed NATG's law firm of Impero's representation. Weaver, however, testified that Impero formalized an attorney-client relationship with Respondent sometime in or after January 1995.

6. By 13 March 1995, it became unclear whether the Texas firm still represented Impero. According to Weaver, Respondent agreed to serve as general counsel for Impero as of 23 March 1995, with the scope of the representation limited to assisting Impero with his resignation from NATG and the recovery of his personal property. He further testified that Respondent's representation of Impero expanded when Impero became

---

6. *See infra* note 13.

involved in an arbitration proceeding, filed in Chicago, Illinois, between NATG and Biotrace International, Inc.[7]

7. In April 1995, NATG initiated litigation against Weaver and Impero in the Two–Hundredth–Eightieth Judicial District of Harris County, Texas.[8] The suit asserted numerous causes of action, including breach of contract, fraud, breach of fiduciary relationship, tortious interference with prospective business relations, negligent misrepresentation, slander, libel, tortious interference with existing business relations, deceptive trade practices, and fraudulent transfers.

8. The only evidence on the record establishing Respondent's representation of either Impero or Weaver are two letters and an unsigned and undated copy of a retainer agreement. The first letter, dated 14 April 1995, is from Respondent and refers to Impero as "my client." The second letter, dated 1 May 1995, is from Respondent to Weaver and Impero, in which Respondent states "[t]his office will represent James Impero and Val Weaver in any proceeding in the States of Maryland[,] Texas, and Illinois at a single rate of $150 per hour...." *See infra* Fee Discussion.

9. Weaver testified that, as of April 1995, his role was that of a [*sic* ] "lightening rod" between Respondent and Impero and that, as a result, he received copies of all documents concerning Impero's legal problems and communicated with both parties on a weekly basis.[9]

---

**7.** Weaver was not involved in this dispute. *See infra* Part I.C.

**8.** NATG actually filed a Petition for Injunction and Damages with Requests for Admissions, Interrogatories, and Production of Documents Attached against Val Weaver, James Impero, Robyn Impero, and the Impero Family Trust.

**9.** A memorandum from Impero to Respondent, dated 10 July 1995, indicates that Weaver and Impero "must communicate once a day so [Respondent should] feed information to [Weaver]." Corroborating this request is a letter to Respondent from Weaver, dated 27 October 1995, acknowledging that "[i]t certainly has not been easy for me over

10. There is no evidence on the record of a retainer agreement between Respondent and Weaver. While Weaver initially stated that he never personally hired Respondent in the Texas matter, he later testified that Impero hired Respondent to represent Impero and Weaver, with Impero agreeing to pay all of Respondent's fees. *See infra* Fee Discussion. Weaver indicated that he initially relied on Respondent's statements that he represented both Weaver and Impero, but later hired Respondent individually when he became a party to the NATG dispute.

11. Respondent hired local counsel in Texas to assist him with the Texas action; Weaver testified he was not certain if the local attorney represented him or Impero or both.

### B. *Charles County, Maryland Action*

1. On 22 July 1995, Respondent filed a complaint and jury demand on Weaver's behalf in the Circuit Court for Charles County, Maryland. Respondent alleged that service of process for the Texas civil action on Weaver, through his wife, was improper because the Sheriff's affidavit was based on false and misleading information. He also alleged that contractual obligations owed by NATG to the Weavers were never fully discharged, and that NATG owed the Weavers monies, stock options, and stock valued in excess of $2,000,000. Finally, the compliant alleged NATG made defamatory statements against Val Weaver in a New York Stock Exchange press release, published in Maryland, that stated that Weaver had breached the duties he owed NATG.

2. On 24 October 1995, Maryland counsel for NATG filed a Motion to Dismiss in the Charles County action.

---

the last few months to act as the daily 'lightning rod' for matters between you and Jim."

3. In a letter to Respondent from Weaver dated 27 October 1995, Weaver, indicating that a dismissal of the Charles County action was a prerequisite to the success of any mediation proceedings taking place in the Texas action, requested that Respondent dismiss the action without prejudice. Respondent did not reply to or act upon Weaver's request.

4. In a letter dated 7 November 1995, Weaver told Respondent that "[t]he state of affairs and apparent conflict now between us forces me to dismiss your legal representation from all activities and matters regarding me [specifically, the federal District Court action [and the Charles County action] and any issues involving Impero and NATG]." At the time he wrote this letter, Weaver did not know that Respondent had not filed the Motion to Dismiss in the Charles County action.

5. On 24 November 1995, Respondent filed a Motion to Withdraw Appearance in the Charles County action. The Charles County Circuit Court initially granted this motion on 13 December 1995. The motion granting the withdrawal was later stricken on 5 January 1996, when the Circuit Court learned that Weaver did not consent to Respondent's withdrawal because Weaver did not know that Respondent had not filed the Motion to Dismiss.

6. On 16 April 1996, NATG filed a second Motion to Dismiss in the Charles County action. Respondent did not answer this motion either.

7. On 28 May 1996, the Circuit Court wrote a letter to Respondent informing him that it had not received an answer to NATG's motions and that, "[g]iven the previous history concerning your representation of Mr. Weaver, [the Court is] forwarding a copy of the Memorandum and Motion to Dismiss directly to him, along with his copy of this letter . . . . to give [Weaver] every opportunity to respond to the Motion to Dismiss."

8. On 11 June 1996, Weaver informed the Circuit Court that he had not spoken with Respondent since October 1995 and that Respondent refused to communicate with Weaver since that date. Weaver then filed, *pro se,* a Motion for Voluntary Dismissal. This motion was granted on 18 June 1996.

## C. *District of Maryland, Harris County, Texas, and Chicago, Illinois Actions*

1. On 19 June 1995, Respondent, on behalf of Impero and his company, filed suit against NATG, Biotrace International, three law firms, two attorneys, and the American Arbitration Association in the United States District Court for the District of Maryland. The complaint alleged a breach of fiduciary duty, breach of contract, fraud, wrongful interference with a contract, replevin, and mandamus.

2. On 20 June 1995, Respondent received a letter from the United States District Court for the District of Maryland that warned him that the complaint he had filed was deficient in many respects. The letter indicated that it was not clear whether the Court had subject matter or personal jurisdiction over the action or any of the defendants, respectively, and that the Court questioned whether venue was proper. The Court advised that Respondent would have to correct the deficiencies before the Court would address the merits of the claims.

3. The record reflects that Respondent neither corrected these deficiencies nor complied with the Court's order.

4. On 26 June 1996, Respondent wrote to Impero and Weaver to discuss the fee for his legal services and expenses, as well as the fees for those attorneys whom he had hired to assist him with Weaver's and Impero's representation. *See infra* Fee Discussion. He also wrote to update them on the status of their respective cases.

With respect to the federal District Court case, Respondent stated he would stagger the filing of three separate complaints on Mr. Weaver's, Mrs. Weaver's, and Mr. Impero's behalf. After filing each complaint, he would move to amend it before he filed the next. His intention in filing the suit in this manner was that the "[f]iling schedules will probably throw off all party defendants with a degree of risk that the Court may not be too fond of our tactics."

With respect to the Chicago arbitration, Respondent indicated that he hoped the arbitration would be "greatly affected" by the federal action in Maryland.

As to the Texas action, Respondent assured them that he would be doing most of the drafting of the initial pleadings, including a motion to move in out-of-state counsel, an entry of appearance, a motion to dismiss for lack of jurisdiction, an affidavit of residency of Impero, and a motion to strike one of the law firms from representing NATG. Respondent also indicated in his letter that he and the Texas counsel would meet with Impero in Texas on 28 June 1996.

Lastly, Respondent stated that he had received an inquiry regarding a possible settlement between NATG, Weaver, and Impero. He indicated, however, that "realistically speaking a settlement with [NATG] is not in the cards."

5.   On 31 July 1995, Respondent filed a Petition for Removal and Consolidation of the Texas action into the United States District Court for the District of Maryland. Informing Weaver of the petition, Respondent indicated that he felt the Texas action should be removed to Maryland because Impero and Weaver were residents of Maryland, and because he thought NATG was not licensed to do business in Texas.

6.   On 1 August 1995, Respondent filed on Impero's behalf a Joinder of Party Co–Defendant in the District Court for Harris County, Texas. The joinder was filed pend-

ing the removal of the Weaver case from Texas to the federal District Court in Maryland.

7. On 8 August 1995, Judge Deborah Chasanow of the U.S. District Court in Maryland issued a written opinion in which she concluded that Respondent "appear[ed] to be confused as to the applicability of the removal statute [28 U.S.C. § 1446][10] to the various proceedings involved." Judge Chasanow informed Respondent that, under the Federal Rules of Civil Procedure, only a defendant can file a removal petition, and that even if Respondent were in a position to make such a filing, the Texas state action could not be removed to a federal district court in Maryland, but rather only to one in

---

10. As to the procedure for removing a civil case, 28 U.S.C. § 1446 (2000) provides:

(a) A defendant or defendants desiring to remove any civil action or criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

(b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

. . . .

(d) Promptly after the filing of such notice of removal of a civil action the defendant or defendants shall give written notice thereof to all adverse parties and shall file a copy of the notice with the clerk of such State court, which shall effect removal and the State court shall proceed no further unless and until the case is remanded.

Texas, if at all. Judge Chasanow not only found that removal of the Weaver case was improper, but that adding Maryland defendants to the Impero case "would destroy whatever diversity jurisdiction currently exists in that case, if any, and would require the dismissal or the transfer of that case to a Maryland circuit court." Judge Chasanow concluded the opinion by entering an Order of Remand.

8. At the time the Motion for Removal was filed by Respondent, a previously scheduled hearing on a temporary injunction pending in the Texas action was scheduled for 11 August 1995. NATG claimed that Respondent did not send notice of the filing of the Petition for Removal to counsel of record in the Texas action until 9 August 1995. Moreover, NATG claimed that Respondent sent the notice by express mail, which arrived on 10 August 1995, requiring a postponement of the 11 August 1995 hearing and resulting in an incurment of expenses by NATG for costs of witness appearance and travel that could not be canceled in time. As a result, NATG filed a Motion for Rule 11 Sanctions in the U.S. District Court in Maryland against Respondent, Weaver, and Impero. Although Weaver testified that Respondent failed to advise him or Impero that these sanctions had been filed against them, a letter dated 21 August 1995 from Respondent to NATG's counsel in Maryland discussing the sanctions indicates that the letter was copied to both Weaver and Impero.

9. On 5 October 1995, Respondent wrote a letter to Impero informing him of the status of his cases, but omitted any mention of the Motion for Sanctions which had been filed against them.

10. On 11 October 1995, Impero called Weaver to inquire whether he was aware of the Motion for Sanctions filed against them. Shortly afterward, Weaver received a facsimile from Respondent informing him of the motion. Weaver testified that he repeatedly tried to

reach Respondent to discuss the motion, but that Respondent failed to return his calls.

11. On 13 October 1995, Weaver reviewed his court file at the U.S. District Court in Maryland and learned that a response to the Motion for Sanctions was due by 16 October 1995. After discussing his situation with the Clerk of Court, Weaver filed a letter with the Court on 17 October 1995, informing Judge Chasanow of his lack of knowledge regarding the motion and his inability to contact Respondent.

Weaver testified that he tried contacting Respondent during the week of 13 October, but to no avail. He also testified that he asked Respondent's secretary if he could review his files. The secretary initially answered affirmatively, but later informed Weaver that Respondent denied Weaver's request to see the files.

Also on 13 October 1995, a request was made by Weaver to NATG on Impero's and Weaver's behalf to dismiss the Motion for Sanctions. This request was granted, but only as to the two men and not as to Respondent.

12. On 26 October 1995, Impero told Respondent he wanted to end the litigation, and instructed him to file a Motion to Dismiss the lawsuit filed in the U.S. District Court in Maryland without prejudice and to return all of his papers to the Weavers.[11] Weaver testified that while Respondent failed to return his papers, he did demand $150,000 as payment for his representation of Impero and/or Weaver.

13. On 21 November 1995, the U.S. District Court granted NATG's Motion for Sanctions against Respondent, reiterating Respondent's lack of legal foundation for the removal of the Texas and Charles County actions to U.S. District Court in Maryland, as well as his failure to explain his actions upon the Court's request. Judge

---

11. Following Impero's advice, Weaver asked Respondent on 24 October 1995 to terminate his NATG-related actions. *See supra* Part I.B.3.

Chasanow concluded that Respondent's "actions indicate that he did not even conduct the bare minimum legal research required by Rule 11 . . . . [and that his] oversight is unconscionable." Furthermore, Judge Chasanow determined that Respondent's "carelessness has resulted in inexcusable delay in state court proceedings, has consumed unnecessary time and resources in federal court, and has forced Defendants to spend unwarranted amounts on litigation. . . ." Respondent was ordered to pay $2500 within 30 days of the date of the Order.

14. On 29 November 1995, the federal District Court action was dismissed pursuant to the Notice of Voluntary Dismissal filed by Respondent.

15. Respondent appealed Judge Chasanow's decision to the U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit affirmed the Order for Sanctions on 27 April 1997.

## D.  *Accounting, Fees, and Expenses*

1. Weaver's wife, Marilyn, testified that she assisted Respondent on one occasion when one of his secretaries left. She testified that "when she first arrived at Respondent's office, the office looked like someone had thrown a party for a four year old." She stated that "there were files on the floor and documents were missing." After two days, she was able to sort the NATG files and put them into binders in chronological order. She indicated that there was no evidence that Respondent kept time sheets for the work he did on the NATG case.

2. Marilyn testified that, once Respondent hired a new secretary, she and the new secretary initiated an accounting system for Respondent, but that she was uncertain whether Respondent ever maintained the system. Marilyn also indicated that Respondent fired the new secretary when she refused to send Impero a bill

for $7000. Additionally, Marilyn testified that Respondent told her to "tell [Impero] he owes us $7000 and $500 in expenses." Marilyn relayed the message to Impero, who requested an accounting of the amount.

3. Despite repeated requests for accounting, Respondent did not provide Weaver or Impero with any formal accounting.

4. A bill dated 25 April 1995 to Impero from Respondent totaled $11,550, less $10,000 already received, for services rendered between 8 March 1995 and 25 April 1995.

5. In a letter dated 1 May 1995, Respondent addressed the scope of his legal representation of Impero and Weaver and his fees for services rendered. He noted his hourly fee of $150, explaining that, "[i]n essence, each client is charged $75.00 per hour for all representations, even though in some instances the matters may refer only to one client, and at other instances the matters will refer to the other client."

6. Weaver testified that Impero paid Respondent $50,000 on their behalf over the course of the representation. Impero indicated in a note to Respondent that he had paid Respondent $5000, and that he was sending Respondent a $20,000 check, dated 2 May 1995. He also stated that he would send Respondent $10,000 more by July 1995.

7. In a letter dated 26 June 1995, Respondent informed Impero and Weaver that, as to the Chicago arbitration, Respondent had hired an attorney to assist him for $1000 as a retainer and at the rate of $100 per hour. Respondent also said he had hired an attorney to assist with the Texas action at the rate of $175 per hour. Additionally, Respondent indicated that he had spent approximately 168 hours on legal representation, excluding social hours, to date. He said he also had incurred $3000 in various business expenses, but acknowledged that Impero had already advanced him $32,000 to cover services rendered in the Texas action for him and the

Weavers. Respondent did not provide any accounting of his hours or receipts to validate his expenses.

8. In response to Impero's concern over Respondent's fee, Respondent, in a letter dated 5 July 1995, acknowledged "that there may have been a colossal misunderstanding on the issue of expenses." He went on to describe client expense accounts in general, noting that such a "fund has not been established by this office as the extent of the expenses has not been known at the time of our agreement." He explained that "[t]he reason for [his] restraint on that issue is that expenses in general do not depend on the client's attorney only, but is also contingent on the activities of other attorneys as well." He hoped that the year's end expenses would not exceed $15,000, but reminded Impero that "the retainers for the indispensable local counsel in Chicago and Houston are set at $6000,[12] the sum considered indeed a tremendous bargain in the legal profession." Telling him that an accounting would follow, Respondent asked Impero to pay the retainer fee to the attorney in Texas in the interim.

9. On 10 July 1995, Impero answered Respondent's letter by explaining his financial situation and by setting forth the fees which he had paid to Respondent and the other attorneys to date. He noted that he had financed "this endeavor 100%" and that he could only "commit to a maximum of an additional $40,000 on top of the $11,000 paid to [his] first attorneys, $10,000 paid to [Respondent] when [he] agreed to [Respondent's] representing [the Imperos], followed by an additional $20,000, with an additional $10,000 to be paid at a later date." Additionally, Impero stated that Biotrace, the other company in the Chicago arbitration, had paid Respondent $2500 for

12. But see Part I.D.7, addressing Respondent's indication that the Chicago attorney's retainer is $1000, and Part I.D.10, which notes that Respondent did not discuss a retainer fee in a letter to the Texas counsel regarding his fees.

services rendered and another $2500 would be forthcoming. Impero also questioned Respondent's deposition fee ($1080) and travel expense reimbursement requests ($776), as Impero had already paid Respondent $2000 for deposition fees and filing fees in the Maryland action, and $2700 in travel expenses between Chicago and Houston.

10. In an unsigned letter dated 15 August 1995 to the local counsel in Texas, Respondent stated that their arrangement called "for a set fee in the amount of $80.00 per hour and a contingent fee of an additional $45.00 per hour, the aggregate hourly fee being $125.00 .... [with] any expenses incurred in connection therewith shall be reimbursed to your office, *i.e.*, telephone, secretarial and paralegal services and the like."

11. In a letter to Impero dated 5 October 1995, Respondent stated:

    In consideration of the Retainer Agreement Provisions, I would like to request the following (a) Commitment to immediately discharge your obligation committed to in June of 1995 and pay to this office $7500.00, $7000.00 being the balance due from the committed payment of $10,000.00 and an additional balance of $500.00 advanced to defray part of the expenses; and (b) Further stipulations that you will fund all assignments with not less than $5000.00 per month to be advanced for fees and expenses on a timely basis.

12. Marilyn Weaver testified that, on or about 1 November 1996, a private investigator who worked for Respondent told her that Respondent wanted the Weavers to pay $150,000 in attorney's fees within 48–hours or Respondent would ruin Weaver and his security clearance, and would bring criminal charges against him. She also testified that Respondent had not only assured her that there would be "no charge for my

family, the·Weavers,"[13] but that she had never discussed any fee agreement with Respondent regarding his representation of her husband; in fact, she indicated that the last time she recalled retaining Respondent's services was over 20 years ago.

Based upon these findings of fact, Judge North concluded that Respondent violated MRPC 1.1, 1.3, 1.4, 1.5(a), 3.1, 8.4(a), and 8.4(d) regarding his attorney-client relationship with complainant Val Weaver.

Respondent excepted generally to Judge North's findings, contending that "all his actions in the [Weaver] matter were taken in good faith with an aim to provide strong representation in a highly contentious legal battle." Specifically, he asserted that he had a legal basis for his actions in the Circuit Court for Charles County; that he would have addressed the deficiencies noted in the Maryland federal action in June 1995 by the U.S. District Court for the District of Maryland if the case had not settled in November; and that he was unaware of the hearing for a temporary injunction in the Texas state court when he filed the removal petition in the Maryland federal court. We address Respondent's exceptions below.

## II.

### A. *Standard of Review*

This Court has original jurisdiction over all attorney disciplinary proceedings. *See Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996); *see also* Md. Rule 16–709(b) (stating "[c]harges against an attorney shall be filed on behalf of the [Attorney Grievance] Commission in the Court of Appeals."). As to Respondent's exceptions to Judge North's findings, "we

---

13. Marilyn Weaver testified that Respondent was a long-time family friend who, on many occasions, had visited her home for dinner and stayed the night. She also said her family referred to Respondent as "Uncle Dushka."

[make] an independent, detailed review of the complete record with particular reference to the evidence relat[ed] to the disputed factual finding." *See Sheridan,* 357 Md. at 17, 741 A.2d at 1152; *Glenn,* 341 Md. at 470, 671 A.2d at 473 (quoting *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973)). In our review, "we must keep in mind that the findings of the [hearing] judge are *prima facia* correct and will not be disturbed unless clearly erroneous." *See Sheridan,* 357 Md. at 17, 741 A.2d at 1152; *Glenn,* 341 Md. at 470, 671 A.2d at 473; *Attorney Grievance Comm'n v. Kemp,* 303 Md. 664, 674, 496 A.2d 672, 677 (1985); *Attorney Grievance Comm'n v. Collins,* 295 Md. 532, 548, 457 A.2d 1134, 1142 (1983) (quoting *Attorney Grievance Comm'n v. Kahn,* 290 Md. 654, 678, 431 A.2d 1336, 1349 (1981)). We note that the hearing judge "may elect to pick and choose which evidence to rely upon," *Kemp,* 303 Md. at 675, 496 A.2d at 677, for she or he is in the best position to assess a witness's credibility. *See Sheridan,* 357 Md. at 17, 741 A.2d at 1152. Therefore, we will not tamper with Judge North's factual findings if they are grounded in clear and convincing evidence. *See Kahn,* 290 Md. at 678, 431 A.2d at 1350.

We recently reiterated the definition of clear and convincing evidence in *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 79, 753 A.2d 17, 35 (2000):

The requirement of "clear and convincing" or "satisfactory" evidence does not call for "unanswerable" or "conclusive" evidence. The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details there of narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and con-

vincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

(quoting *Berkey v. Delia,* 287 Md. 302, 320, 413 A.2d 170, 178 (1980) (quoting 30 AM.JUR. 2d EVIDENCE § 1167) (citing *Whittington v. State,* 8 Md.App. 676, 679 n. 3, 262 A.2d 75, 77 n. 3 (1970))).

## B. *Violation of MRPC 1.1*

**Maryland Rule of Professional Conduct 1.1**—*Competence.* A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

■ After thoroughly reviewing the record, we conclude that Judge North's findings of fact as they pertain to MRPC 1.1 are supported by clear and convincing evidence. Acknowledging that Respondent possessed sufficient legal competence to represent Weaver in the matters undertaken, the hearing judge nonetheless determined that Respondent failed to exercise "requisite thoroughness and preparation required of an attorney because he failed to research the removal issue." Respondent excepts to this finding, arguing that the U.S. District Court in Maryland should not have granted any sanctions against him because the grounds for filing the removal petition were not baseless and that Judge North should not have based her conclusion that Respondent violated MRPC 1.1 on a "wholesale acceptance of the Rule 11 [sanction] matter." We overrule Respondent's exceptions as to his violation of MRPC 1.1 for the reasons set forth below.

In *Mooney,* we noted that:

The requirement of adequate preparation has long been recognized as part of a lawyer's responsibility to provide competent representation, and it is not without significance that, in the current Code of Professional Responsibility embodied in the MLRPC, the duty to provide competent representation is given "the place of honor as the first

ingredient in the lawyer-client relationship." Former DR 6–101(A)(2) precluded a lawyer from handling a matter "without preparation adequate in the circumstances," and the failure to make a proper investigation of the facts of a case prior to trial has led to discipline.

359 Md. at 75, 753 A.2d at 27 (QUOTING 1 GEOFFREY C. HAZARD, JR. AND W. WILLIAM HODES, THE LAW OF LAWYERING, 2d ed. § 1.1:101 (1997)) (citing *In Re Conduct of Chambers,* 292 Or. 670, 642 P.2d 286 (1982); *People v. Felker,* 770 P.2d 402 (Colo.1989)). Moreover, the Comment to MRPC 1.1 explains that "[c]ompetent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures. . . . It also includes adequate preparation. . . ."

Judge North found in this case by clear and convincing evidence that Respondent filed the Petition for Removal without researching properly the applicable laws or rules. The fact that the U.S. District Court also found that Respondent's preparation was lacking woefully, and thus deserving of sanction, is sustentative of the hearing judge's independent finding.

We conclude that Respondent's filing of the removal petition was more than "without preparation adequate in the circumstances"; by not assuming the relatively simple, yet essential, task of consulting 28 U.S.C. § 1446,[14] Respondent clearly dishonored his obligation to provide Weaver with competent representation. We, therefore, overrule Respondent's exception and agree with Judge North's conclusion that, while Respondent possessed the ability to conduct such research, he inexplicably failed to do so.

### C.  *Violation of MRPC 1.3*

**Maryland Rule of Professional Conduct 1.3—***Diligence.*
A lawyer shall act with reasonable diligence and promptness in representing a client.

---

**14.**  *See supra* note 10, for relevant text.

■ Judge North concluded that Respondent violated MRPC 1.3 based on her findings that Respondent failed repeatedly to return Weaver's phone calls, respond to his letters, allow him to review his file, or provide basic accounting for assertedly earned fees. Arguing that he "demonstrate[d] an overabundance of diligence and concern in representing the interests of Mr. Impero and Mr. Weaver," Respondent advances three exceptions to these findings. First, he argues that he correctly refused to permit Weaver to review the files because "Respondent's representation chiefly was of Mr. Impero."[15] Second, Respondent argues that "any lapse of communication did not cause any adverse effect on the conduct of the litigation." Third, Respondent contests that Weaver requested an accounting and argues that, even if he did, any accounting that Respondent would be required to provide would be owed to Impero (who did not testify before Judge North) because Impero "was to provide the main financial support for the litigation and representation."

Judge North was presented with voluminous documents from Respondent's office, most of which were either in complete disarray or "organized" in a chaotic sort of filing system. Nonetheless, she was able to determine that, while a signed fee agreement between Respondent and Weaver may not have existed, Weaver was one of Respondent's clients. In a letter to Impero and Weaver, dated 1 May 1995, Respondent "confirm[s] the consensus reached among yourselves [Weaver and Impero] and this counsel on the wide range" of legal representation and legal fees. Respondent states that he will represent Impero and Weaver in "any proceeding in the States of Maryland[,] Texas, and Illinois at a single rate of $150.00 per hour. In essence, *each client* is charged with $75.00 per hour for all representations, even though in some instances the matters may refer only to one client...." (Emphasis added).

---

**15.** In a letter to Respondent from Weaver, dated 27 October 1995, Weaver acknowledges "Impero's role as the principle litigant," and that Weaver looked to Impero for guidance as to what steps to take in the litigation. *See, e.g., supra* note 11.

Additionally, Weaver terminated Respondent's representation of him in a letter dated 7 November 1995; such a dismissal supports the notion that an attorney-client relationship previously existed between the parties.

Given the evidentiary support for these findings of fact, we overrule Respondent's first and third exceptions. With respect to the first exception, whether Impero was Respondent's principal client in the NATG dispute does not negate the fact that Weaver also was Respondent's client in that dispute. As to the third exception, Weaver, as a client of Respondent's, maintained the right to review his file and receive an accounting of Respondent's billing, even if Impero, and not Weaver, was paying for Weaver's accrued fees. The 1 May 1995 letter clearly indicates that Respondent charged Weaver $75 per hour for representation. Whether the "consensus" reached between Impero and Weaver included an agreement for Impero to pay Weaver's fees is irrelevant. Respondent did not purport to represent Weaver as a *pro bono* client; rather, Respondent charged Weaver for services and, as a result, Weaver should have been given access to the files and Respondent owed a duty of accounting for time and expenses.

We also overrule Respondent's second exception, as we find no merit in Respondent's assertion of "no harm, no foul" and "all is well that ends well." Respondent implies that, because Weaver's cases were dismissed ultimately, the fact that Respondent failed to communicate with his client is immaterial. We disagree. Specifically, we remind Respondent that, by failing to dismiss the Charles County action in accordance with Weaver's instructions, he risked derailing Weaver's settlement efforts. Respondent should note that, in *Attorney Grievance Comm'n v. Pinkney*, we held that an attorney violated MRPC 1.3 when she led her client to believe she had filed a lawsuit on the client's behalf when, in fact, she had not done so. 311 Md. 137, 141, 532 A.2d 1367, 1369 (1987). We determined that the attorney violated the rule "by neglecting a matter entrusted to her." *Id.* In the present case,

Respondent clearly neglected a matter—Weaver's instructions to dismiss the Charles County action—entrusted to him.

Additionally, we stated in *Mooney*, "this Court has consistently regarded neglect and inattentiveness to a client's interests to be [an ethical violation] warranting the imposition of some disciplinary sanction." 359 Md. at 76, 753 A.2d at 27 (quoting *Attorney Grievance Comm'n v. Montgomery*, 296 Md. 113, 120, 460 A.2d 597, 600 (1983)). We conclude that Judge North correctly found, by clear and convincing evidence, that Respondent's inattentiveness to Weaver's interests rose to a level of neglect unacceptable in the legal profession. Therefore, Respondent violated MRPC 1.3.

### D.  *Violation of MRPC 1.4*

**Maryland Rule of Professional Conduct 1.4**—*Communication.*

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

■ Judge North found that, although Respondent initially maintained the appropriate level of communication with his client, Respondent's diligence in keeping Weaver current on the status of his cases diminished greatly during the later course of the representation. Judge North found that Respondent failed to keep Weaver adequately apprised of the time spent and expenses accrued during the case. Judge North also found that Respondent refused to allow Weaver access to the files, and that he failed to act upon Weaver's specific requests, such as his 27 October 1995 request that Respondent dismiss the Charles County action. Respondent also failed to inform Weaver in a timely manner of the Motion for Sanctions filed against Weaver, Impero, and Respondent in the U.S. District Court for Maryland.

Moreover, Judge North found that Respondent failed to explain to Weaver his strategy in litigating the disputes. While Respondent initially provided Weaver with insight as to why, for example, he wanted to file the complaints in the U.S. District Court for Maryland in a staggered fashion, Respondent failed, as noted above, to inform Weaver of the pending Motion for Sanctions, failed to respond on Weaver's behalf regarding the sanctions, and failed to return Weaver's later phone calls with respect to the sanctions. Judge North pointed out that Weaver was forced to send several letters directly to Judge Chasanow because he was unable to reach his attorney.

We conclude that Judge North was presented with clear and convincing evidence upon which to determine that Respondent violated MRPC 1.4. The Comment to MRPC 1.4 provides that "even when a client delegates authority to the lawyer, the client should be kept advised of the status of the matter," for "[k]eeping the client informed is a basic responsibility of an attorney." *Mooney*, 359 Md. at 89, 753 A.2d at 34. Because of the tremendous importance placed upon attorney-client communication, we have stated that "the lack of communication with one's client, for whatever reason, is a matter of continuing concern to the public." *Mooney*, 359 Md. at 76, 753 A.2d at 27 (quoting *Montgomery*, 296 Md. at 120, 460 A.2d at 600). Respondent's lack of communication with Weaver, most offensively in regard to his ignoring Weaver's request to dismiss the Charles County action, is inexcusable and in clear violation of MRPC 1.4. We therefore overrule Respondent's exceptions as to this violation.

### E.  *Violation of MRPC 1.5(a)*

**Maryland Rule of Professional Conduct 1.5—***Fees.*

(a) A lawyer's fees shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

■ Given the condition of Respondent's records, Judge North understandably found herself unable to fathom any bookkeeping system Respondent might have. employed. Although she determined Respondent's fee was set at a reasonable $150 per hour, given Respondent's expertise and experience, she questioned the claimed $150,000 total fee because it was impossible to determine from the billing "system" whether Respondent actually earned that amount. The hearing judge realized that Respondent would have had to work 40 hours per week for six and a quarter months on Weaver's case alone for Weaver (or Impero) to have owed Respondent $150,000. Judge North found, however, no evidence of Respondent even working 20 hours a week on the Weaver and Impero cases during the course of 1995.[16] Moreover, there was no evidence that Respondent worked solely on the Impero/Weaver/NATG matter, which he asserts became "in essence Respondent's exclusive professional practice [during 1995]."

---

16. In a letter to Weaver and Impero, dated 26 June 1995, Respondent stated that "[a]ccording to our records, the time consumed for all legal representation ... is a rounded figure of one hundred sixty eight hours (168), thus averaging circa 10 hours per week since March." He went on to say that "[m]y impression is that we have not computed all hours dedicated to your case, but no adjustments will be made for this period."

On the contrary, Judge North found in Respondent's records evidence that Respondent represented other clients on other matters during the time period in question.

We agree with Judge North's conclusion that Respondent violated subsections of MRPC 1.5(a) and that such a conclusion was supported by clear and convincing evidence.

### F.  *Violation of MRPC 3.1*

**Maryland Rule of Professional Conduct 3.1**—*Meritorious claims and contentions.*

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue thereon, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.  A lawyer may nevertheless so defend the proceeding as to require that every element of the moving party's case be established.

■  Judge North found that "Respondent's attempt to remove all of the actions into the U.S. District Court in Maryland was frivolous."  Respondent excepts to the finding, arguing that he was trying to "litigate with more practicality" by consolidating the Weaver and Impero actions to "avoid unnecessary costs and delays."  Agreeing with Judge North, we overrule this exception and conclude that a reading of 28 U.S.C. § 1446 [17] would have made it crystal clear to Respondent that, under the circumstances, he could not remove the Texas action to a federal court in Maryland.  His professed concern for "judicial economy" is unavailing in the face of the rules of federal civil procedure.

### G.  *Violation of MRPC 8.4(a) and 8.4(d)*

**Maryland Rule of Professional Conduct 8.4**—*Misconduct.*

It is professional misconduct for a lawyer to:

**17.**  *See supra* note 10 for relevant text.

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through acts of another;

. . .

(d) engage in conduct that is prejudicial to the administration of justice; . . . .

Judge North concluded that Respondent did not commit any crimes or engage in conduct involving fraud, deceit, dishonesty, or misrepresentation. She did conclude, however, that Respondent's act of filing a motion to remove the Texas action, without any legal basis, was prejudicial to the administration of justice. She also found that Respondent interfered with the administration of justice when he failed to mail the Motion for Removal to opposing counsel until two days before a scheduled hearing in Texas, forcing NATG to incur unnecessary expenses.

Respondent excepts to these findings, arguing that he tried to consolidate and remove the Weaver and Impero actions into the U.S. District Court in Maryland in order to "litigate with more practicality." Respondent also contends that he was not aware of the hearing in Texas for the temporary injunction, and that because he had procured local counsel in the Texas action, he "had no reason to know of any scheduled hearings, assuming there were any . . . ." [18] *Id.* at 22.

Given the clear and convincing evidence upon which Judge North made her conclusions of law, we overrule Respondent's exceptions. First, having affirmed Judge North's conclusions that Respondent violated MRPC 1.1, 1.3, 1.4, 1.5(a), and 3.1, we conclude that Judge North had clear and convincing evidence upon which to determine that Respondent violated MRPC 8.4(a). Second, we find it particularly troublesome that Respondent believes that, even though he served as lead counsel in the NATG dispute for Weaver and Impero, he

18. Respondent goes so far as to argue that "no such scheduled hearing appears on the docket entries from the Texas court in the NAT[G] action against Impero and Weaver. He further contends that no such hearing in that court ever was, in fact, scheduled."

nevertheless was absolved of the responsibility of keeping abreast of any recent filings by the opposing party and resultant court hearing dates because he had hired local counsel to, in his words, "assist" him with the case. In a 26 June 1995 letter, Respondent reassured Weaver and Impero that he, and not the Texas counsel, would be doing the bulk of the work on their case. As we noted in *Mooney*, "[f]ailure to represent a client in an adequate manner violates MRPC 8.4(d)." 359 Md. at 83, 753 A.2d at 31. By not fulfilling the duties he owed to his client, Respondent failed to represent Weaver adequately. We also address briefly Respondent's strenuous exceptions here to Judge Chasanow's denial of his Petition for Removal and Consolidation "without a hearing, and *prior to any opposition to it submitted by opposing counsel.*" (Respondent's emphasis). Respondent seems to imply that Judge Chasanow's actions were inappropriate. We find this implication—that a court cannot, *sua sponte*, deny a motion to remove a case for lack of jurisdiction—to be completely unfounded, without any support, and having no place, as a collateral attack, in this disciplinary proceeding. We therefore reject entirely Respondent's argument on this point.

## III.

In determining the proper sanction for Respondent's misconduct, we note that it is well settled that

"[t]he purpose of disciplinary proceedings against an attorney is to protect the public rather than to punish the erring attorney." *Attorney Grievance Commission v. Hamby*, 322 Md. 606, 611, 589 A.2d 53, 56 (1991). "The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Commission v. Awuah*, 346 Md. 420, 435, 697 A.2d 446, 454 (1997). The severity of the sanction depends upon the facts and circumstances of the case before this Court. *Hamby*, 322 Md. at 611, 589 A.2d at 56. Imposing a sanction protects the public interest "because it demon-

strates to members of the legal profession the type of conduct which will not be tolerated." *Id.*

*See Attorney Grievance Comm'n v. Mooney,* 359 Md. at 96, 753 A.2d at 38; *Attorney Grievance Comm'n v. Brown,* 353 Md. 271, 295, 725 A.2d 1069, 1080 (1999) (quoting *Attorney Grievance Comm'n v. Ober,* 350 Md. 616, 631, 714 A.2d 856, 864 (1998)).

Reminding us that Respondent has been the recipient of an unpublished reprimand, by Order of this Court dated 3 February 1999 for violation of MRPC 1.3, 1.4, and 8.4(d) as the result of a reciprocal discipline case from the District of Columbia, Bar Counsel recommends that Respondent be suspended indefinitely from the practice of law for the misconduct involved in the present case. Respondent counters that disciplinary action is not warranted when, "if anything, this is a case of over-zealous representation."

In *Brown,* 353 Md. at 281, 725 A.2d at 1073, we agreed with the hearing judge's findings that Brown violated MRPC 1.3, 1.4, 3.3, 5.5, 7.1, and 8.4. Despite mitigating factors,[19] such as the attorney having "reduced his case load since the complaints were filed, sought a mentor on case management procedures [ ], changed his office mailing procedures, and sought counseling for his 'tendencies' to procrastinate," we ordered an indefinite suspension, with the right to reapply for admission in one year. *Brown,* 353 Md. at 296, 725 A.2d at 1081.

In *Mooney,* the hearing judge found that Mooney provided incompetent representation when he failed, among other things, to appear in court for a client's trial and to maintain communications with his clients. 359 Md. at 64, 67, 69–70, 753 A.2d at 21, 23, 25. Upholding the conclusions that Mooney violated MRPC 1.1, 1.3, 1.4, 5.1, 5.3, and 8.4, we suspended Mooney indefinitely from the practice of law. 359 Md. at 97, 753 A.2d at 39.

---

**19.** Respondent presses no cognizable mitigating circumstances in the present case.

In *Attorney Grievance Comm'n v. Cohen*, an attorney who was the subject of two complaints, one involving a custody dispute and the other a bankruptcy proceeding, was found to have violated MRPC 1.1, 1.3, 1.4, 8.1(a), 8.4(c), and 8.4(d). *Cohen*, 361 Md. 161, 167, 760 A.2d 706, 709, 713–14, 2000 Md. Lexis 670, at *9–10, *24–25 (2000). On that record, we determined that Respondent possessed "very little or no appreciation of the seriousness of his misconduct" and that his "pattern of behavior demonstrates Respondent's inability to conform his conduct within the bounds of the Maryland Lawyer's Rules of Professional Conduct." *Cohen*, 361 Md. at 178, 760 A.2d at 715, 2000 Md. Lexis 670, at *30. Noting that we had previously imposed a 90 day suspension for the attorney's prior violations of MRPC 4.4 and 8.4(d), we ordered an indefinite suspension, with the right to reapply for admission in six months. *Cohen*, 361 Md. at 179, 760 A.2d at 716, 2000 Md. Lexis 670, at *31.

██ Bar Counsel argues that its recommendation is warranted based upon Judge North's findings that Respondent practiced law in a manner that was "disorganized," "unprepared," "neglectful," and "increasingly uncommunicative," "prejudicial to the administration of justice," and in "contravention of the law" and of the "specific instructions of his client." We agree. Consistent with *Mooney, Cohen*, and *Brown*, we order an indefinite suspension for Respondent, for we find that to be the appropriate sanction in light of Respondent's conduct here and of the prior reprimand.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT; INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST DUSHAN S. ZDRAVKOVICH; RESPONDENT'S SUSPENSION SHALL COMMENCE THIRTY DAYS FROM THE FILING OF THIS OPINION.**