DISCIPLINARY COUNSEL *v.* GOLDBLATT.

[Cite as *Disciplinary Counsel v. Goldblatt,*
118 Ohio St.3d 310, 2008-Ohio-2458.]

(No. 2007–1961—Submitted January 23, 2008—Decided May 29, 2008.)

**Per Curiam.**

{¶ 1} Respondent, Jay Alan Goldblatt of Cleveland, Ohio, Attorney Registration No. 0014263, was admitted to the practice of law in Ohio in 1983. We suspended respondent's license to practice on January 27, 2006, on an interim basis pursuant to Gov.Bar R. V(5)(A)(4), upon receiving notice that he had been convicted of two felonies. See *In re Goldblatt,* 108 Ohio St.3d 1422, 2006-Ohio-289, 841 N.E.2d 785.

{¶ 2} The Board of Commissioners on Grievances and Discipline recommends that we now indefinitely suspend respondent's license to practice, based on findings that he attempted to arrange a sexual encounter with an underage girl. We agree with the board that respondent's illicit conduct, which led to his two felony convictions, violated the Code of Professional Responsibility. We also agree that an indefinite suspension is appropriate.

{¶ 3} Relator, Disciplinary Counsel, charged respondent with Disciplinary Rule violations, including DR 1–102(A)(3) (prohibiting a lawyer from engaging in illegal conduct involving moral turpitude) and 1–102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on his fitness to practice law). A panel of the board heard the case, including the parties' stipulations to the cited misconduct, made findings of misconduct, and recommended an indefinite suspension. The board adopted the panel's findings and recommended sanction.

{¶ 4} Respondent filed objections but did not argue against the board's findings of misconduct or recommendation. He instead stated that he was filing the objections "solely for the purpose of securing a hearing to make himself available to this Court, through his counsel, to answer any questions of the Court." At oral argument, however, counsel urged us to credit respondent for his interim suspension, arguing that he had already been barred from practice for two years, due in part to the stay of the disciplinary proceedings during respondent's

unsuccessful appeal of his conviction. Respondent insisted that the resulting delay in effect penalized him for exercising his right to appeal.

{¶ 5} Relator did not voice an objection to respondent's unexpected assertions at oral argument, but aptly pointed out that Gov.Bar R. V(5)(C) precludes a disciplinary hearing until all appeals from a conviction are concluded. But we need not examine the validity of this rule. Because respondent did not raise the issue of interim-suspension credit in his written objections, his request for interim-suspension credit is not properly before us.

## Misconduct

{¶ 6} In June and July 2004, respondent tried through a series of three telephone conversations to arrange a sexual encounter with a minor. He unwittingly made the arrangements with an undercover FBI agent.

{¶ 7} In the fall of 2005, the Cuyahoga County Common Pleas Court found respondent guilty of compelling prostitution in violation of R.C. 2907.21, a felony of the third degree, and possessing criminal tools in violation of R.C. 2923.24, a felony of the fifth degree. The court sentenced respondent to five years of community-control sanctions, which included submitting to periodic alcohol and drug testing, remaining in psychotherapy and attending 12–step meetings with periodic reports to the court by the therapist, and applying for inactive status with this court's Attorney Registration Section. The common pleas court further prohibited respondent from possessing pictures of naked children and ordered periodic inspections of his personal computer to help ensure that he did not violate the order. Respondent is now classified as a sex offender and is subject to applicable registration and other restrictions.

{¶ 8} In accordance with his sentence, respondent immediately applied for inactive status. In February 2006, however, the common pleas court found respondent in violation of his community-control sanctions after a random inspection of his personal computer uncovered 11 images of children in the nude. Respondent served 42 days in jail as a result.

{¶ 9} As the panel and board found, respondent's illicit acts in violation of R.C. 2907.21 and 2923.24 constitute violations of DR 1–102(A)(3) and 1–102(A)(6).

## Sanction

{¶ 10} In determining the appropriate sanction to impose for attorney misconduct, "we consider the duties violated, the actual or potential injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases." *Stark Cty. Bar Assn. v. Ake,* 111 Ohio St.3d 266, 2006-Ohio-5704, 855 N.E.2d 1206, ¶ 44. We weigh the aggravating and mitigating factors to decide whether circumstances warrant a more lenient or

harsher disposition. See Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). Because each disciplinary case involves unique facts and circumstances, we are not limited to the factors specified in the rule and may take into account "all relevant factors" in determining which sanction to impose. BCGD Proc.Reg. 10(B).

{¶ 11} Respondent concedes that he violated the duties to the public and the legal profession that are set forth in DR 1–102(A)(3) and (6). His misconduct risked unspeakable harm. Respondent professed to recognize the reprehensible nature of his behavior; however, he also offered face-saving rationalizations to the hearing panel and tried to downplay his crimes.

{¶ 12} Recordings of telephone conversations unmistakably established that respondent agreed to meet an undercover agent at a local park because the agent promised to procure a young girl. In those conversations, respondent asked the agent for "[s]omething young," a girl of about "nine or ten or eleven," and "the younger the better." Respondent then agreed to pay $200 to do as much sexually with the child as that amount would buy. After making these arrangements by phone, respondent left his office, went to his bank and withdrew $200, and drove to the park to meet the pimp and the girl.

{¶ 13} Yet during the hearing, respondent insisted that he went to the park just "to talk to a pimp about the possibility of hooking up with a young girl for sex." Implausibly suggesting that he had had only an interest in the "possibility" of a sexual encounter and did not intend to actually meet with a young girl, respondent testified:

{¶ 14} "I didn't know if I was capable of meeting with a young girl. I certainly was open to the possibility. I certainly talked about it, I haggled with the guy. I mean, I was willing to pursue this. Whether I would have gone through with it, I don't know.

{¶ 15} " * * * But I'm just making that distinction because I always knew that I had the opportunity to walk away. And I pray that I would have—that if this had been real, that I would have used that opportunity and walked away."

{¶ 16} Respondent also lied about the circumstances underlying his convictions. In preparation for his hearing with the panel, respondent consulted a psychiatrist to obtain an independent expert opinion on his condition. He told Dr. Stephen Levine, a specialist in patients with sexual difficulties, that he had attempted to arrange a sexual encounter with a teenager. Only during questioning by the hearing panel did Dr. Levine learn that respondent had actually attempted to procure a sexual encounter with a girl as young as nine.

{¶ 17} Finally, the inspection of respondent's personal computer revealed that 11 images of nude children engaged in various activities other than sex had been downloaded after his conviction. Respondent claimed to have no knowledge or explanation for how these images came to be there, but the common pleas court found that he had violated the terms of his community-control sanctions. Respondent continued to profess his innocence during these proceedings, but we are not convinced.

{¶ 18} When a lawyer engages in or attempts to engage in sexually motivated conduct with an underage victim, an indefinite suspension of the lawyer's license to practice is appropriate. See *Disciplinary Counsel v. Pansiera* (1997), 77 Ohio St.3d 436, 674 N.E.2d 1373 (indefinite suspension of lawyer convicted of seven counts of corrupting a minor). Accord *Atty. Grievance Comm. of Maryland v. Thompson* (2001), 367 Md. 315, 786 A.2d 763 (indefinite suspension of lawyer convicted of stalking 13–year–old boy). Moreover, lawyers convicted of felonies stemming from such conduct cannot expect to receive credit for an interim suspension imposed pursuant to Gov.Bar R. V(5)(A)(4). Such credit is given only when the attorney poses no danger of reoffending. See *Disciplinary Counsel v. Margolis*, 114 Ohio St.3d 165, 2007-Ohio-3607, 870 N.E.2d 1158, ¶ 26 (no credit for an interim suspension unless the lawyer shows that the felony conviction manifested a "one-time, never-to-be-repeated mistake").

{¶ 19} Having considered the duties breached by respondent, the potential harm of his conduct, and the sanctions imposed in similar cases, our last task is to weigh the aggravating and mitigating factors of respondent's case. As an aggravating factor, we find first that self-interest motivated respondent to commit his crimes. See BCGD Proc.Reg. 10(B)(1)(b). Respondent also attempted to minimize his culpability rather than acknowledge the extent of his wrongdoing. See BCGD Proc.Reg. 10(B)(1)(g).

{¶ 20} In mitigation, we find that respondent has no prior disciplinary record, cooperated in the disciplinary process, and is currently serving the sentence that the criminal-justice system imposed (community-control sanctions). See BCGD Proc.Reg. 10(B)(2)(a), (d), and (f). Respondent, who had a career as in-house corporate counsel prior to his convictions, also provided eight letters evidencing his good character apart from the instant misconduct, including letters from his rabbi, family members, and colleagues professing his professional competence and committed service to his temple and community. See BCGD Proc.Reg. 10(B)(2)(e).

{¶ 21} Respondent additionally submitted Dr. Levine's report and testimony to show that he has successfully sought treatment to control his sexual deviance and that this effort has mitigating effect under BCGD Proc.Reg. 10(B)(2)(g)(i) through (iv) (requiring proof that a lawyer has been diagnosed with a mental

disability by a qualified health-care professional, that the disability contributed to cause the lawyer's misconduct, and that the lawyer has experienced a sustained period of successful treatment, and a prognosis by a qualified health-care provider that the lawyer will be able to return to competent, ethical practice).

{¶ 22} Dr. Levine, who practices with the licensed independent social worker with whom respondent has been in therapy since his 2004 arrest, is a recognized expert in the field of paraphilia, which he describes as "the clash between individual sexual interest and social rules governing sexual behavior." Dr. Levine based his evaluation on approximately four hours of interviews with respondent in 2007 and on the results of psychometric tests. His assessment focused less on diagnosis and more on the progress respondent had made since his arrest.

{¶ 23} Respondent referred to himself as a "sex addict," but Dr. Levine eschewed that term, describing respondent instead as someone who lost control over his sexual behavior. Dr. Levine testified that if he had evaluated respondent before his arrest, he likely would have diagnosed him with traits common to four mental illnesses: narcissistic-personality disorder, dysthymia (chronic unhappiness for more than two years), marital dysfunction, and paraphilia. More important to him than a preliminary diagnosis, however, was that respondent had entered individual psychotherapy, marital therapy, and group therapy for compulsive men and shown "dramatic improvement" in managing these conditions. Dr. Levine also noted that respondent had joined Sex and Love Addicts Anonymous, a 12–step program, and that he had consulted a psychiatrist for medication.

{¶ 24} Dr. Levine expressed confidence in respondent's improvement and commitment to his treatment program. And though he acknowledged his inclination toward giving emotionally ill patients a second chance, Dr. Levine concluded that if respondent continued in his present course of treatment, he posed little risk to the public. Dr. Levine supported respondent's eventual return to the practice of law.

{¶ 25} Paul Caimi, associate director of the Ohio Lawyers Assistance Program, Inc. ("OLAP"), also testified as to respondent's progress toward recovery. Respondent entered a five-year OLAP "Mental Health Contract" in January 2006. The contract contains conditions to facilitate respondent's therapy, including a requirement that he allow Caimi to closely monitor his activities. Caimi assured the panel that respondent is in complete compliance with the contract.

{¶ 26} We accept as mitigating the fact that respondent is in therapy and has made progress. But we continue to doubt his fitness to practice law. We concur in the reasoning of the Supreme Court of Maryland, which in grappling with the appropriate sanction for a lawyer guilty of stalking a young boy, wrote:

{¶ 27} "Respondent's behavior in pursuing the child/victim in this case grossly overstepped the boundaries of appropriate adult-child relationships. In so doing, Respondent demonstrated, and even acknowledged to himself, that he may not be trusted around children in general. Although adult-child interactions are not related directly to Respondent's practice of law, the concept of trust is an inseparable element of any attorney's practice. It is inconceivable, therefore, how we presently may authorize and entrust Respondent with the enumerable confidential, fiduciary, and trust-based relationships that attorneys, by their profession, are required to maintain in their dealings with their clients or the public.

{¶ 28} "We acknowledge Respondent's diagnosis and apparent affirmative response to his treatment regimen, but do not find that determinative here. Regardless of his present 'high level of motivation' not to repeat the misconduct that led to the present charges, the fact remains that Respondent stalked a child, and that criminal act undermines our view of his present trustworthiness and fitness as a lawyer." (Footnotes omitted.) *Atty. Grievance Comm. of Maryland v. Thompson*, 367 Md. at 327, 786 A.2d 763.

{¶ 29} In ordering the indefinite suspension of that lawyer's license, the Maryland Supreme Court noted that the disciplinary process serves " 'to protect the public rather than to punish the erring attorney. The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed. The severity of the sanction depends upon the facts and circumstances of the case before this Court. Imposing a sanction protects the public interest because it demonstrates to members of the legal profession the type of conduct which will not be tolerated.' " Id., 367 Md. at 329, 786 A.2d 763, quoting *Atty. Grievance Comm. of Maryland v. Zdravkovich* (2000), 362 Md. 1, 31–32, 762 A.2d 950.

{¶ 30} Respondent's trustworthiness and fitness to practice law have been severely undermined by his criminal behavior. We are convinced that an indefinite suspension will help protect the public, deter other lawyers from similar wrongdoing, and preserve the public's trust in the legal profession. Respondent is therefore suspended indefinitely from the practice of law in Ohio with no credit for his interim suspension.

{¶ 31} Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

Jonathan E. Coughlan, Disciplinary Counsel, and Carol A. Costa, Assistant Disciplinary Counsel, for relator.

Laurence A. Turbow, L.P.A., Inc., and Laurence A. Turbow, for respondent.